STATE OF MINNESOTA

COUNTY OF HENNEPIN

**FILED**

**11 FEB -1 PH 4:05**

BY. PROBATE/MENTAL HEALTH
FOURTH DISTRICT COURT

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type:  Other

In re the trusteeship created by
the Director of the State of Nevada
Department of Business and Industry

File No.: 27-TR Cv-11-13

### PETITION OF WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, FOR INSTRUCTION IN THE ADMINISTRATION OF A TRUST PURSUANT TO MINN. STAT. § 501B.16

TO THE DISTRICT COURT FOR THE FOURTH JUDICIAL DISTRICT:

Petitioner Wells Fargo Bank, National Association, as trustee (the "Trustee") for the above described trust estate (the "Trust Estate"), by and through its undersigned attorneys, petitions this Court as follows:

**Introduction[1]**

1.   The Bonds. The Trustee serves as trustee for municipal bonds (the "Bonds")[2] having an initial principal amount of $451,448,217.30 issued in 2000 by the Director of the State of Nevada Department of Business and Industry. The Director issued the Bonds to finance the acquisition, design and construction of a monorail system operating in the City of Las Vegas, Nevada. The owner and operator of the monorail system is the Borrower, which is obligated to pay principal and interest on the Bonds as they come due. The Bonds are scheduled to mature in tranches through the year 2040. To provide additional security for the benefit of the Bondholders, Ambac Assurance Corporation, as Bond Insurer, issued a Municipal Bond Insurance Policy and a Surety Bond. As is more fully described herein, the Trust Estate includes the Bond Insurer's payments under the Policies for principal and interest on the

---

[1]   Any defined term not defined in this Introduction is defined below.

[2]   The Bonds, as defined in Paragraph 7 herein, are the 1st Tier Bonds issued under the Senior Indenture. The "Bondholders," as referenced herein, are the holders of the Bonds.

**Exhibit B**

Bonds as they become due. Part of the sale proceeds from the issuance of the Bonds was used to pay in full the premium for the Policies. At the time the Bonds were issued in 2000, the Bond Insurer was rated "AAA" by Standard & Poor's and Fitch Ratings, and "Aaa" by Moody's Investor Service. This was the highest credit rating for each of these rating services.

2.      The Bankruptcy. On January 13, 2010, the Borrower filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Case"). During the pendency of the Bankruptcy Case, the Borrower has failed to deliver any funds to the Trustee for debt service on the Bonds. No plan of reorganization has been confirmed. Aside from any distributions under a future Chapter 11 plan, the only other source for payment of debt service on the Bonds is the Bond Insurer's payments under the Policies.

3.      The Rehabilitation Proceeding. The Bond Insurer is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin (the "Commissioner"). In March 2010, the Bond Insurer created a Segregated Account and allocated a number of policies and other obligations, including the Policies, from its general account into the Segregated Account. The Commissioner almost immediately after this event commenced a Rehabilitation Proceeding with respect to the Segregated Account in the Circuit Court of Dane County, Wisconsin (the "Rehabilitation Court"). The Rehabilitation Court has issued an injunction preventing any payment under the Policies until a Plan of Rehabilitation is approved and becomes effective. The Trustee and Bondholders have requested that the Rehabilitation Court modify its injunction, remove the Policies from the Segregated Account and return the Policies to the general account of the Bond Insurer. Those motions and requests have been denied by the Rehabilitation Court, and appeals are currently pending. In October, 2010, the Commissioner proposed a Plan of Rehabilitation that would provide for the treatment of all claims against the Segregated Account, including the Policies. The Rehabilitation Court approved the Rehabilitation Plan on January 24, 2011. Under the Rehabilitation Plan, up until June 7, 2020, claimants are to receive a recovery consisting of cash in the amount of 25% of their claims and surplus

2314295.11

notes with a face amount of 75% of their claims, as those claims come due[3]. The Rehabilitation Plan does not address how claims arising after June 7, 2020 will be handled or paid.

4.     The Settlement Agreement and Commutation.     A group of certain Bondholders representing approximately seventy-three percent (73%) of the aggregate principal amount of the Bonds (the "Settling Bondholders"), the Bond Insurer and the Commissioner have negotiated a Settlement Agreement which includes a Commutation providing for the payment of cash and the delivery of surplus notes to the Trustee for the benefit of the Bondholders in exchange for the full and final settlement of all claims under the Policies. The Settling Bondholders have directed the Trustee to proceed with the Commutation. The Commutation provisions of the Settlement Agreement would result in a substantially different treatment of the Bondholders than under the Rehabilitation Plan, in that:

(a)     The Commutation provides for the immediate distribution of cash and surplus notes, whereas the Rehabilitation Plan provides for the distribution of cash and surplus notes in accordance with the amount due on each Payment Date, but provides no guidance regarding how claims will be handled or paid after June 7, 2020. The distribution under the Rehabilitation Plan is thus subject to the risk that the Bond Insurer and the Segregated Account will not have the financial capacity to make such distributions over the extended period of time that such distributions become due, and is subject to even further uncertainty with respect to the post-2020 time period.

(b)     The Commutation provides that the Bond Insurer's claims against the Borrower for payments made by the Bond Insurer under the Policies will be assigned to the Trustee for the benefit of the Bondholders, whereas the Rehabilitation Plan provides that, with each payment made, the Bondholders' rights to receive payments from the Borrower will be assigned to the Bond Insurer with respect to that payment.

5.     The Concerns of a Minority of Bondholders and the filing of the Petition.     If the Policies are Commuted as provided in the Settlement Agreement, the appeals commenced by the Trustee and by certain Bondholders from the adverse rulings by the Rehabilitation Court and any related costs and

---

[3]     The terms of the Rehabilitation Plan are more fully described below.

expenses of such appeals will be terminated.   Under this scenario, all Bondholders will receive the distribution of cash and surplus notes provided for in the Commutation and will retain the right to receive any payments from the Borrower in the Bankruptcy Case.   Although the Commutation is supported by the Settling Bondholders, representing 73% of the aggregate principal amount of the Bonds, a minority of Bondholders have expressed concern with respect to the Commutation.   The Trustee believes that the Commutation is a reasonable resolution of the claims against the Bond Insurer in respect of the Policies, but because the Commutation would apply to all Bondholders, the Trustee believes that this Court should consider not only the views of the Settling Bondholders who support the Commutation, but also the concerns of those Bondholders who do not support it, and, after hearing and considering all of these views, instruct the Trustee with respect to the Commutation.   For this purpose, the Trustee has filed the present Petition.

**Factual Background**

6.     The Trustee is a national banking association with a main corporate trust office in Minneapolis, Minnesota, duly established and existing, and authorized to accept and execute trusts.

7.     <u>Senior Indenture and the Senior Bonds</u>.   Prior to the time that the Initial Petition (as described below) was filed, the Trustee was the duly appointed, qualified and acting Trustee under that certain Senior Indenture, dated as of September 1, 2000 (the "Senior Indenture"), by and between the Director of the State of Nevada Department of Business and Industry (the "Director") and the Trustee. Pursuant to the Senior Indenture, the Director issued its Las Vegas Monorail Project Revenue Bonds, 1st Tier Series 2000 (the "Bonds") and its Las Vegas Monorail Project Revenue Bonds, 2nd Tier Series 2000 (the "Second Tier Bonds", and together with the Bonds, the "Senior Bonds").   The Director issued the Senior Bonds either as Current Interest Bonds or Capital Appreciation Bonds.   A true and correct copy of the Senior Indenture is attached hereto as Exhibit A.   Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned to such terms in the Senior Indenture.

2314295.11

8.  Subordinate Indenture and the Subordinate Bonds. Prior to the time that the Subsequent Petition (as described below) was filed, the Trustee also served as trustee under that certain Subordinate Indenture, dated as of September 1, 2000 (the "Subordinate Indenture", between the Director and the Trustee, pursuant to which the Director issued its Las Vegas Monorail Project Revenue Bonds, 3rd Tier Series 2000A-1 (the "Third Tier Bonds" or "Subordinate Bonds").

9.  Initial Petition. On or about November 12, 2009, the Trustee filed with this Court its initial Petition for Instruction (the "Initial Petition") with respect to the trust estate described herein, seeking the appointment of a separate and independent trustee for the Second Tier Bonds (the "Co-Trustee"), with the Trustee continuing to serve as trustee for the Bonds and the Subordinate Bonds.

10.  As a result of the filing of the Initial Petition, and by Order of this Court, dated January 5, 2010, this Court appointed U.S. Bank National Association as Co-Trustee for the Second Tier Bonds, with all such indenture trustee rights and duties under the Senior Indenture with respect to the Second Tier Bonds.

11.  Subsequent Petition. On or about April 8, 2010, the Trustee filed a subsequent Petition for Instruction (the "Subsequent Petition") seeking the appointment of a separate and independent trustee for the Third Tier Bonds (the "Successor Trustee"), with the Trustee continuing to serve as the trustee for the Bonds and the Co-Trustee continuing to serve as trustee for the Second Tier Bonds.

12.  As a result of the filing of the Subsequent Petition, and by Order of this Court, dated May 14, 2010, this Court appointed Law Debenture Trust Company of New York as Successor Trustee for the Third Tier Bonds, with all such indenture trustee rights and duties under the Subordinate Indenture.

13.  The Trustee continues to serve as trustee for the Bonds.

14.  The Project, the Borrower and the Financing Agreement. The Director loaned the proceeds arising from the issuance of the Senior Bonds and Subordinate Bonds to the Las Vegas Monorail Company, a Nevada nonprofit corporation (the "Borrower"), pursuant to that certain Financing

Agreement, dated as of September 1, 2000 (the "Financing Agreement"), by and between the Director and the Borrower. The Borrower used the proceeds of the Senior Bonds and the Subordinate Bonds to finance the expansion of a monorail transportation system (the "Project") located in Las Vegas, Nevada. The Financing Agreement requires the Borrower to make payments sufficient to pay interest and principal on the Senior Bonds and Subordinate Bonds as they come due. A true and correct copy of the Financing Agreement is attached hereto as Exhibit B.

15. Under the terms of the Senior Indenture, the Director assigned to the Trustee, for the benefit of the holders of the Senior Bonds, all of its rights and interests in the Financing Agreement and all revenues paid and payable by the Borrower thereunder.

16. Debt Service Payments. The maturity schedule for the Bonds is attached hereto as Exhibit C. Under the terms of the Senior Indenture, the Principal Payment Date for the Bonds is January 1 of each year, and the Interest Payment Date is each January 1 and July 1 (a Principal Payment Date or an Interest Payment Date is referred to hereinafter as a "Payment Date"). Beginning January 2, 2008, and on each Payment Date thereafter, the Borrower failed to make the debt service payments required under the Financing Agreement.

17. Borrower's Event of Default and Bankruptcy. The Borrower's failure to make the required debt service payments constitutes an "Event of Default" under the Financing Agreement and the Senior Indenture, which Event of Default continues to exist. On January 13, 2010, the Borrower filed its Bankruptcy Case. The Borrower's Bankruptcy Case is being administered *In re Las Vegas Monorail Company*, case number 10-10464-BAM. No plan of reorganization has been confirmed.

18. The Bond Insurer and the Policies. Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance corporation (the "Bond Insurer"), regulated by the Commissioner, issued a municipal bond insurance policy (the "Policy") that insures payment of the principal of, interest and accreted value, on the Bonds as and when such payments become due. A true and correct copy of the Policy is attached hereto as Exhibit D. Proceeds of the Policy are not available to pay the principal, interest on and accreted value of the Second Tier Bonds or the Third Tier Bonds.

6

19.  `  The Bond Insurer has also issued a Surety Reserve Bond (individually, the "First Tier Surety Reserve Bond," and together with the Policy, the "Policies") with respect to the First Tier Debt Service Reserve Fund (the "First Tier DSRF"). A true and correct copy of the Surety Reserve Bond is attached hereto as Exhibit E. The First Tier Surety Reserve Bond had an original coverage amount of $20,991,807.50 (the "Surety Bond Coverage").

20.  Trustee Demand on Policies. As a result of the Borrower's failure to make required debt service payments, the Trustee has on successive Payment Dates withdrawn amounts from the First Tier DSRF in accordance with the provisions of the Senior Indenture, the balance of which First Tier DSRF is now zero. In accordance with the terms of the Policies, the Trustee made demand on the First Tier Debt Surety Reserve Bond to the extent necessary to make debt service payments due on the Bonds on July 1, 2009 and January 1, 2010. The Bond Insurer honored those demands, leaving an amount available on the First Tier Debt Surety Reserve Bond of $459,036.35.

21.  Policies Allocated to a Segregated Account. On March 24, 2010, the Board of Directors of the Bond Insurer established a segregated account pursuant to Wisconsin Statute § 611.24(2) (the "Segregated Account") to segregate certain segments of the Bond Insurer's liabilities, including certain policies issued by the Bond Insurer insuring or relating to (i) credit defaults swaps, (ii) residential mortgage-backed securities, (iii) student loans, and (iv) certain other identified policies including the Policies described herein (the "Segregated Account Policies").

22.  The Rehabilitation Court. According to filings made with the Securities and Exchange Commission by the parent of the Bond Insurer, on March 24, 2010, the Commissioner commenced rehabilitation proceedings in the Rehabilitation Court with respect to the Segregated Account (the "Rehabilitation Proceedings") in order to permit the Commissioner to facilitate an orderly run-off and/or settlement of the liabilities allocated to the Segregated Account pursuant to the provisions of the Wisconsin Insurers Rehabilitation and Liquidation Act. On March 24, 2010, the Rehabilitation Court issued an injunction effective until further order of the Rehabilitation Court enjoining certain actions by holders of Segregated Account Policies (the "Temporary Injunction").

23. <u>Payment Defaults Under Bonds and Policies</u>. The Trustee made demands on the Policies to the extent necessary to make debt service payments on the Bonds due July 1, 2010 and January 1, 2011. In light of the Temporary Injunction, the Bond Insurer did not make payments in response to these demands, resulting in payment defaults under the Bonds and the Policies.

24. The payment defaults described above under the Bonds and under the Policies remain uncured.

25. <u>Rehabilitation Court Proceedings</u>. On April 5, 2010, the Trustee filed a Motion To Modify Temporary Injunction Order and To Intervene (the "Motion to Intervene") requesting that the Rehabilitation Court modify the Temporary Injunction, grant the Trustee leave to intervene and enter an order removing the Policies from the Segregated Account and returning those policies to the general account of the Bond Insurer. A group of certain holders representing a majority in aggregate principal amount of the Bonds outstanding (the "Majority Bondholders")[4] subsequently filed a similar motion. The relief requested by the Trustee and the Majority Bondholders in these motions and the claims arising under the Policies, are hereinafter referred to as the "Claims."

26. On July 16, 2010, the Rehabilitation Court issued an order denying the Trustee's and the Majority Bondholders' motions. The Trustee and the Majority Bondholders have each filed their appeals of the Rehabilitation Court's order to the Wisconsin Court of Appeals, District IV.

27. <u>Consequences of Appeals</u>. Continued pursuit of the Claims on appeal could, if successful, result in the removal of the Policies from the Segregated Account and the return of the Policies to the general account of the Bond Insurer. If the appeals are unsuccessful, the Policies would remain in the Segregated Account. The likelihood of success with respect to the Claims on appeal is uncertain. Also uncertain is the financial benefit to the Bondholders resulting from the removal of the Policies from the Segregated Account and the return of the Policies to the general account of the Bond Insurer.

---

[4]   The Majority Bondholders are comprised of a group of Bondholders that includes the Settling Bondholders (as defined in paragraph 4 herein) and certain Bondholders that did not participate in the final negotiation of the Settlement Agreement.

28.   <u>The Rehabilitation Plan</u>.   On October 8, 2010, the Commissioner filed a plan of rehabilitation with respect to the Segregated Account (the "Rehabilitation Plan") with the Rehabilitation Court along with a Disclosure Statement Accompanying Plan of Rehabilitation (the "Commissioner's Disclosure Statement").   On January 24, 2011, the Rehabilitation Court entered an order approving the Rehabilitation Plan.   A true and correct copy of the Rehabilitation Plan is attached hereto as <u>Exhibit F</u> and a true and correct copy of the Commissioner's Disclosure Statement is attached hereto as <u>Exhibit G</u>.

29.   The basic financial terms of the Rehabilitation Plan approved by the Rehabilitation Court are as follows:

(a)   The Rehabilitation Plan requires that claims under the Policies for the payment of principal, accreted value or interest (each a "Policy Claim") will not be accelerated but will be paid as the same become due on each Payment Date, which for certain Bonds continues until 2040.

(b)   Up until June 7, 2020, each semi-annual Policy Claim will be paid as follows: (i) 25% in cash (each a "Cash Installment"), to the extent of available cash, and (ii) 75% in Surplus Notes of the Segregated Account (the "Surplus Notes").   The Rehabilitation Plan does not address how claims arising after June 7, 2020 will be handled or paid.

(c)   The core terms of the Surplus Notes of the Segregated Account are as follows:

(1)   All payments on the Surplus Notes will be subject to prior approval of the Commissioner, in his absolute discretion.

(2)   The Surplus Notes are unsecured obligations that will not be entitled to any sinking fund.

(3)   The Surplus Notes are scheduled to mature on June 7, 2020, and bear interest on a taxable basis at 5.1% per annum, subject to the discretion of the Commissioner and to the extent of available cash.

(4)   The Surplus Notes will not be subject to acceleration in the event of non-payment.

2314295.11

(5)　Interest on the Surplus Notes will be scheduled for payment each June 7. In the event of non-payment, unpaid interest will be compounded annually.

(6)　The Surplus Notes will be expressly subordinated in right of payment to the following: (i) all existing or future indebtedness of the Segregated Account other than any other surplus notes or contribution notes or similar obligations of the Segregated Account, or any indebtedness that is expressly subordinate to, or ranks *pari passu* with, the Surplus Notes, (ii) all existing or future claims of policy holders, and (iii) all other claims against the Segregated Account with statutory distribution priority over claims with respect to the Surplus Notes (including, without limitation, claims for costs of administration).

(d)　With each payment made under the Rehabilitation Plan, the Bondholders' rights to receive distributions in the Bankruptcy Case will be assigned to the Commissioner with respect to that payment (as a function of the subrogation rights of the Bond Insurer under the Policies). Accordingly, under the Rehabilitation Plan, the Bondholders will not receive any payments from the Borrower in its Bankruptcy Case.

30.　Settlement Discussions. On or about May 10, 2010, the Majority Bondholders, acting pursuant to Section 7.05 of the Senior Indenture, provided the Trustee with a written direction (the "Direction") instructing the Trustee to, among other things, follow the strategic direction of the Majority Bondholders, as communicated through its counsel, with respect to: (i) actions in the Rehabilitation Proceedings; (ii) any settlement discussions with the Commissioner, the Segregated Account and the Bond Insurer; and (iii) actions in the Bankruptcy Case.

31.　The Majority Bondholders, acting through its counsel, have been engaged in negotiations with the Commissioner, the Segregated Account and the Bond Insurer for purposes of developing a proposed settlement with respect to the Claims.

32.　The Settlement Agreement. On December 28, 2010, the Settling Bondholders advised the Trustee that the Settling Bondholders had entered into a Settlement Agreement, dated as of December

2314295.11

27, 2010 (the "Settlement Agreement"), with the Bond Insurer, the Segregated Account and the Commissioner. A true and correct copy of the Settlement Agreement is attached hereto as <u>Exhibit H</u>.

33.    <u>Terms of the Commutation</u>. The Settlement Agreement provides for a transaction in which the Policies are to be commuted to effectuate a release of the Bond Insurer from all liabilities and obligations under the Policies in exchange for the following consideration to be provided to the Trustee on behalf of all of the Bondholders (the "Commutation"):

(a)    The Segregated Account will make a cash payment (the "Commutation Cash Payment") to the Trustee on behalf of the Bondholders in the aggregate amount of $111,000,000 less any cash payments made under the Policies from and after the date of the Settlement Agreement until the date of the closing of the Commutation (the "Closing Commutation") in immediately available funds which the Trustee has been instructed to apply as follows:

(1)    to payment of the Trustee Fees and Expenses[5],

(2)    to reimbursement to the Settling Bondholders of the Settling Bondholders Professional Fees[6], and

(3)    to distribution Pro Rata[7] to all Bondholders (other than the Bond Insurer, if and to the extent it is a Bondholder) who are holders of record on the date set by the Trustee under the Senior Indenture (the "Record Date").

(b)    The Segregated Account will issue to the Trustee, on behalf of the Bondholders, Surplus Notes, due on June 7, 2020, on terms and conditions consistent with the terms and conditions of

---

[5]    The Settlement Agreement defines "Trustee Fees and Expenses" as the reasonable expenses of the Trustee incurred necessary to protect the interests of the Bondholders and reasonable charges and expenses of the Trustee incurred in the performance of its powers and duties under the Senior Indenture, to the extent not previously paid or reimbursed and otherwise reimbursable or payable to the Trustee under the Senior Indenture.

[6]    The Settlement Agreement defines "Settling Bondholder Professional Fees" as the documented, reasonable out-of-pocket fees and expenses of the Majority Bondholders paid to their retained professional advisors and incurred in connection with enforcement of the rights of the Bondholders under the Policies, and any amounts paid by the Majority Bondholders by way of indemnification of the Trustee to the extent the Trustee is entitled to be reimbursed for any such amounts under the Senior Indenture.

[7]    The Settlement Agreement defines "Pro Rata" as the proportion of, in the case of a current interest bond, the aggregate outstanding principal amount of and accrued interest on such bond and, in the case of a capital appreciation bond, the aggregate outstanding accreted value of such bond to, in each case, the aggregate outstanding principal amount of and accrued interest (in the case of current interest bonds), and accreted value (in the case of capital appreciation bonds), on the Bonds as of September 30, 2010.

2314295.11

the Surplus Notes to be issued under the Rehabilitation Plan, in the aggregate principal amount of

$90,000,000 to be distributed by the Trustee on a Pro Rata basis to all Bondholders (other than the Bond

Insurer) who are holders of record on the Record Date.

(c)     The Bond Insurer will transfer $2,500,000 in aggregate principal amount of

Current Interest Bonds and $6,000,000 in Capital Appreciation Bonds having an accreted value of

$3,111,995 as of September 30, 2010 beneficially owned by the Bond Insurer, and any proceeds or other

consideration received from and after the date of the Settlement Agreement on such Bonds, to the Trustee

for and on behalf of the Bondholders on a Pro Rata basis.

(d)     The Bondholders will be entitled to all payments made by the Borrower within or

outside of the Bankruptcy Case from and after the date of the Settlement Agreement on account of the

Bonds, without regard to the Bond Insurer's subrogation rights[8].

34.     Offer to Purchase. Under the terms of the Settlement Agreement, if the Commutation is

not consummated, the parties have negotiated an alternate set of terms and conditions under which the

Bond Insurer would commence an offer to purchase the interests of all Bondholders in the Policies (the

"Offer to Purchase") that would, in effect, result in a commutation of the Policies to the extent of the

aggregate of Policy Claims allocable to the Bondholders who accept the Offer to Purchase. The Trustee

is not seeking instruction with respect to the Offer to Purchase.

35.     Settlement Direction to Trustee. On December 28, 2010, the Settling Bondholders

provided the Trustee with a direction (a "Settlement Direction"), instructing the Trustee to, among other

things: (a) file a Petition for Instruction in the Administration of the Trust under the Senior Indenture

pursuant to Minn. Stat. § 501B.16 (the "Trust Petition Proceeding"), seeking instruction authorizing the

Trustee to settle and resolve all Claims against the Bond Insurer based on the terms of the Commutation;

(b) prosecute the Trust Petition Proceeding to a hearing on the merits of the reasonableness of the

---

[8]     In contrast, under the express terms of the Policy and the Rehabilitation Plan, the Bondholders' rights to receive payments from the
Borrower are not retained by the Bondholders, but instead, are assigned to the Bond Insurer for each payment made to the Bondholders
under the Policy or the Rehabilitation Plan.

2314295.11

Commutation under the Settlement Agreement; and (c) obtain all other approvals necessary to consummate the Commutation.

36.    <u>Trustee's Power to Settle Claims under Senior Indenture</u>. The substantive law governing the Senior Indenture is the law of the State of Nevada as set forth in Section 12.07 of the Senior Indenture. As such, the applicable substantive law this Court should consider with respect to the administration of the Trust Estate and the discharge of the Trustee's duties includes the law of the State of Nevada.

37.    The Uniform Trusts Act as adopted by the State of Nevada (N.R.S. §§ 163.010 through 163.200) confirms that a trustee has the powers provided in the trust instrument, expressed by law or granted by the court upon petition, as necessary or appropriate to accomplish a purpose of the trust, except a court may not grant a power expressly prohibited by the trust instrument. N.R.S. § 163.023. Nevada law expressly requires that, except as otherwise expressly provided in a trust instrument, all the powers enumerated in N.R.S. §§ 163.265 through 163.410, inclusive, <u>must be incorporated</u> in such trust instrument <u>with the same effect as though such language were set forth verbatim in the instrument,</u> and such powers are in addition to the common-law or statutory powers of the fiduciary. N.R.S. § 163.260(1). One such Trustee power incorporated into the Senior Indenture by Nevada law is the Trustee's power, as a fiduciary, to compromise, adjust, arbitrate, sue on or defend, abandon or otherwise deal with and settle claims in favor of or against the estate or trust as the fiduciary deems advisable. N.R.S. § 163.375. Under this provision, a fiduciary's decision is conclusive between the fiduciary and the beneficiaries of the estate or trust and the person against or for whom the claim is asserted, in the absence of fraud by such person. Likewise, in the absence of fraud, bad faith or gross negligence of the fiduciary, the fiduciary's decision is conclusive between the fiduciary and the beneficiaries of the estate or trust. N.R.S. § 163.375.

38.    The Senior Indenture contains no express provisions that prohibit the Trustee from compromising claims on behalf of the Bondholders. Rather, the Senior Indenture grants the Trustee authority to settle claims, in that:

2314295.11

(a)     Section 7.04 of the Senior Indenture vests in the Trustee the power to exercise the Bondholders' remedies, direct all proceedings and take any action as the Trustee shall deem most effectual.

(b)     Subject to the conditional rights of the holders of a majority of the outstanding principal amount of the Bonds to direct enforcement proceedings, only the Trustee has the power to "affect, disturb or prejudice the security" of the Trust Estate under the Senior Indenture.

(c)     The Senior Indenture irrevocably appoints the Trustee as the true and lawful attorney-in-fact of the Bondholders for the purpose of exercising and prosecuting on their behalf such rights and remedies as may be available to the Bondholders under the provisions of the Bonds, the Senior Indenture and the Financing Agreement.

(d)     The power to negotiate and agree upon settlements with respect to the Claims is inherent within the power to commence remedial procedures.

39.     Trust Estate Includes Bond Insurer Payments.  In the case at hand, the Bond Insurer payments made under the Policies are part of the Trust Estate, in that:

(a)     The Trust Estate consists of all Revenues and any amounts held in any fund or account established pursuant to the Senior Indenture and pledged to secure the payment of the principal of and interest on the Bonds in accordance with their terms and the provisions of the Senior Indenture.

(b)     The Senior Indenture defines "Revenues" to mean all moneys received by the Director or the Trustee for the account of the Director pursuant to, or with respect of, the Financing Agreement for the benefit of the Bonds, including without limiting the generality of the foregoing, the Senior Loan Payments (including both timely and delinquent payments, any late charges, and paid from whatever source).

(c)     Claims for monetary damages under the Policies are claims for Senior Loan Payments that are delinquent or that are expected to be discharged in the Borrower's Bankruptcy Case and, as such, any payments made under the Policies are part of the Trust Estate.

2314295.11

40.    Effect of Commutation. The Commutation would serve to release the Bond Insurer of all its obligations under the Policies, thus affecting the rights of all of the Bondholders. For that reason, and to afford all Bondholders an opportunity to review and evaluate the Commutation, the Trustee has commenced this proceeding.

41.    Trustee Assessment of Commutation. Based on the information the Trustee has received to date, the Trustee has reviewed and assessed the Commutation. The Trustee believes that, compared to the alternatives of either continued litigation with the Bond Insurer or treatment under the Rehabilitation Plan, the Commutation provides Bondholders with a higher degree of certainty. As such, the Trustee believes that it is reasonable for the Commutation to be presented to this Court, for the Bondholders to review and consider the Commutation as part of this proceeding, and for the Court to determine whether or not the Commutation is in the best interest of all Bondholders, in light of the available alternatives.

42.    Trustee's Administration Costs. Whether or not the Commutation is consummated, the Trustee will continue to have responsibilities to perform under the Senior Indenture with respect to the administration of the Trust Estate, including, without limitation, the prosecution of the claims in Bankruptcy Court. The Trustee must have resources to continue to meet these duties and obligations, and the Senior Indenture and the Financing Agreement expressly grant the Trustee certain rights, immunities and privileges to obtain such resources (collectively, the "Reimbursement and Indemnification Rights")[9]. To allow the Trustee to perform its duties as required by the Bankruptcy Case, the Senior Indenture and the Commutation provisions of the Settlement Agreement, this Court's Order should authorize the Trustee to withhold from the Commutation Cash Payment such sums as necessary to meet the Trustee's costs and expenses in administering the Trust Estate.

---

[9]    The Reimbursement and Indemnification Rights include: compensation and reimbursement to the Trustee under Section 8.06 of the Senior Indenture; no expenditure or risk of Trustee funds or otherwise incurrence of financial liability under Section 8.01(A) and 8.03(E) of the Senior Indenture; payment of reasonable fees and expenses incurred by Trustee under Section 7.3 of the Financing Agreement; security and indemnification for the Trustee in exercise of rights or powers at direction of Bondholders under Section 8.03(B) and 7.05 of the Senior Indenture; lien on all funds prior to and superior to lien of the Bondholders for compensation, all reasonable expenses and charges of the Trustee under Section 8.06 of the Senior Indenture; and if an Event of Default occurs and is continuing, all Revenues and any other funds shall be applied by the Trustee first to payment of any expenses necessary in the opinion of the Trustee to protect the interests of the Bondholders and payment of the reasonable charges and expenses of the Trustee incurred in and about the performance of its powers and duties under the Senior Indenture as set forth in Section 7.03 of the Senior Indenture.

2314295.11

43.     <u>Jurisdiction of the Court.</u> This Court has the jurisdiction to bind all parties with an interest in the Trust Estate with an Order directing the Trustee to proceed with the Commutation.

44.     <u>Venue is Proper.</u> Venue is proper in Hennepin County because the Trustee has a main place of business in Minneapolis, Minnesota, and the place of administration of the trust is in Minneapolis, Minnesota. Minn. Stat. § 501B.17.

**Request for Relief**

WHEREFORE, pursuant to the provisions of Minn. Stat. § 501B.16 and all other applicable law, the Trustee respectfully requests that this Court:

1.      Make and enter herein an Order designating the time and place when the respective parties in interest may be heard upon the matters set forth in this Petition; that notice of the hearing be served in the manner specified in the accompanying Order and as provided by Minn. Stat. § 501B.18;

2.      Undertake to represent all parties in interest who are unascertained or not in being, or who are minors or incapacitated, pursuant to the provisions of Minn. Stat. § 501B.19;

3.      At such designated time and place this Court make a further Order as follows:

(a)     Determining that the Bond Insurer payments under the Policies are part of the Trust Estate.

(b)     Determining that the Commutation provisions in the Settlement Agreement are reasonable, and that it is within the authority of the Trustee to consummate the Commutation, taking into account the Trustee's Reimbursement and Indemnification Rights.

(c)     Determining whether or not the Commutation is in the best interest of all Bondholders, in light of the available alternatives, and based upon the Court's determination that the Commutation is in the best interest of all Bondholders, directing the Trustee to proceed with and consummate the Commutation as set forth in the Settlement Agreement, taking into account the Trustee's Reimbursement and Indemnification Rights.

2314295.11

(d)    In the event the Court directs the Trustee to proceed with the Commutation, authorizing the Trustee to withhold from the Commutation Cash Payment paid to the Bondholders such sums as the Trustee deems necessary to continue to meet its obligations in the administration of the Trust Estate in accordance with the express provisions of the Senior Indenture.

(e)    Declaring the Trustee's actions to be consistent with the Trustee's fiduciary duties and obligations to the Bondholders under the Senior Indenture.

4.    Granting such other and further relief as this Court may deem lawful, just and proper.

Dated: February 1, 2011

DORSEY & WHITNEY LLP

By: _____
Patrick J. McLaughlin
Attorney Reg. No. 71080
Todd C. Pearson
Attorney Reg. No. 230935
50 South Sixth Street
Suite 1500
Minneapolis, MN 55402
Telephone (612) 340-2600

Attorneys for the Trustee

## ACKNOWLEDGMENT

The undersigned acknowledges that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

_____

2314295.11

## LIST OF PARTIES

Director of the State of Nevada
Department of Business and Industry
555 East Washington Avenue, Suite 4900
Las Vegas, Nevada 89101


Wells Fargo Bank National Association
625 Marquette Avenue
Minneapolis, MN  55402