B

FINANCING AGREEMENT

Between

DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY

And

LAS VEGAS MONORAIL COMPANY
A nonprofit corporation organized under the laws of the State of Nevada

Dated as of September 1, 2000

relating to

THE DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
LAS VEGAS MONORAIL PROJECT REVENUE BONDS
1ST TIER SERIES 2000

and

THE DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
LAS VEGAS MONORAIL PROJECT REVENUE BONDS
2ND TIER SERIES 2000

and

THE DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND INDUSTRY
LAS VEGAS MONORAIL PROJECT REVENUE BONDS
3RD TIER SERIES 2000

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS.................................................................2
    SECTION 1.1.   DEFINITION OF TERMS .................................... 2
    SECTION 1.2.   NUMBER AND GENDER................................... 2
    SECTION 1.3.   ARTICLES, SECTIONS, ETC............................... 2
ARTICLE II   REPRESENTATIONS .................................................. 2
    SECTION 2.1.   REPRESENTATIONS OF THE DIRECTOR............... 2
    SECTION 2.2.   REPRESENTATIONS OF THE BORROWER................. 3
ARTICLE III  COMPLETION OF THE PROJECT, SECURITY INTEREST,
             ISSUANCE OF THE BONDS............................................. 5
    SECTION 3.1.   COMPLETION OF PROJECT; BEST EFFORTS; SECURITY
                   INTEREST............................................... 5
    SECTION 3.2.   ISSUANCE OF BONDS ...................................... 6
    SECTION 3.3.   REQUISITION FOR CONSTRUCTION FUND,
                   CONTINGENCY FUND, COSTS OF ISSUANCE FUND............ 7
    SECTION 3.4.   REVISIONS TO PLANS AND SPECIFICATIONS ............ 7
    SECTION 3.5.   CERTIFICATE OF COMPLETION ......................... 8
    SECTION 3.6.   COMPLETION OF PROJECT IF BOND PROCEEDS
                   INSUFFICIENT; SURPLUS PROCEEDS...................... 8
    SECTION 3.7.   DEFAULT BY CONTRACTORS .......................... 8
    SECTION 3.8.   CHANGE ORDERS ....................................... 8
    SECTION 3.9.   LIMITATION OF DIRECTOR'S LIABILITY .............. 9
ARTICLE IV   LOANS OF PROCEEDS; DEPOSITS TO TRUSTEE; REPAYMENT
             PROVISIONS ........................................................ 9
    SECTION 4.1.   LOAN OF BOND PROCEEDS; ISSUANCE OF BONDS......... 9
    SECTION 4.2.   DEPOSITS TO TRUSTEE; REPAYMENT AND PAYMENT
                   OF OTHER AMOUNTS PAYABLE.......................... 13
    SECTION 4.3.   UNCONDITIONAL OBLIGATION............................ 15
    SECTION 4.4.   ASSIGNMENT OF DIRECTOR'S RIGHTS.................... 16
    SECTION 4.5.   AMOUNTS REMAINING IN FUNDS.......................... 16
ARTICLE V    SPECIAL COVENANTS AND AGREEMENTS........................ 16
    SECTION 5.1.   RIGHT OF ACCESS TO THE PROJECT, BOOKS, AND
                   RECORDS ............................................. 16

## TABLE OF CONTENTS
### (continued)

Page

SECTION 5.2.    MAINTENANCE, OPERATION AND INSURING OF PROJECT; BUDGET; TAXES ................................................ 17

SECTION 5.3.    MAINTENANCE OF EXISTENCE; QUALIFICATION IN THE STATE ........................................................................ 18

SECTION 5.4.    COOPERATION ........................................................... 19

SECTION 5.5.    COMPLIANCE WITH LAWS; LICENSES ...................... 19

SECTION 5.6.    FINANCING COVENANTS .......................................... 19

SECTION 5.7.    AUDITED FINANCIAL STATEMENTS; EMPLOYMENT AND OTHER REPORTS ............................................... 23

SECTION 5.8.    RATE COVENANT ....................................................... 24

SECTION 5.9.    GENERAL TAX COVENANT ........................................ 24

SECTION 5.10.   SPECIAL ARBITRAGE CERTIFICATIONS .................... 25

SECTION 5.11.   SUBSTITUTION OF THE MANAGER OF THE PROJECT .......... 25

SECTION 5.12.   NO WARRANTY OR CONDITION OR SUITABILITY BY DIRECTOR .............................................................. 25

SECTION 5.13.   INDEPENDENT ENGINEER ...................................... 26

SECTION 5.14.   BOND INSURANCE ................................................... 26

SECTION 5.15.   INTERCONNECTION OF THE PROJECT ..................... 26

SECTION 5.16.   CONTINUING DISCLOSURE .................................... 26

SECTION 5.17.   OTHER COVENANTS ............................................... 27

ARTICLE VI     DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF PROCEEDS .................................................................... 27

SECTION 6.1.    OBLIGATION TO CONTINUE PAYMENTS ................ 27

SECTION 6.2.    APPLICATION OF NET PROCEEDS .......................... 27

SECTION 6.3.    INSUFFICIENCY OF NET PROCEEDS ...................... 28

SECTION 6.4.    DAMAGE TO OR CONDEMNATION OF OTHER PROPERTY .............................................................. 28

ARTICLE VII    EVENTS OF DEFAULT AND REMEDIES ........................... 28

SECTION 7.1.    EVENTS OF DEFAULT ............................................. 28

SECTION 7.2.    REMEDIES ON DEFAULT ......................................... 29

SECTION 7.3.    AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES ............................................................... 30

SECTION 7.4.    NO REMEDY EXCLUSIVE .......................................... 30

# TABLE OF CONTENTS
## (continued)

Page

SECTION 7.5.   NO ADDITIONAL WAIVER IMPLIED BY ONE WAIVER .......... 30

ARTICLE VIII   PREPAYMENT ...................................................................................... 31

SECTION 8.1.   REDEMPTION OF BONDS WITH PREPAYMENT
MONEYS ................................................................................. 31

SECTION 8.2.   OPTIONS TO PREPAY INSTALLMENTS ..................................... 31

SECTION 8.3.   MANDATORY PREPAYMENT ...................................................... 31

SECTION 8.4.   AMOUNT OF PREPAYMENT ........................................................ 32

SECTION 8.5.   NOTICE OF PREPAYMENT ........................................................... 32

ARTICLE IX   NON-LIABILITY OF DIRECTOR; EXPENSES:
INDEMNIFICATION ............................................................................. 32

SECTION 9.1.   NON-LIABILITY OF DIRECTOR .................................................. 32

SECTION 9.2.   EXPENSES ........................................................................................ 33

SECTION 9.3.   INDEMNIFICATION ....................................................................... 33

ARTICLE X   MISCELLANEOUS .................................................................................. 34

SECTION 10.1.   NOTICES ......................................................................................... 34

SECTION 10.2.   SEVERABILITY .............................................................................. 35

SECTION 10.3.   EXECUTION OF COUNTERPARTS ............................................. 35

SECTION 10.4.   AMENDMENTS, CHANGES AND MODIFICATIONS ............... 35

SECTION 10.5.   GOVERNING LAW ........................................................................ 35

SECTION 10.6.   AUTHORIZED REPRESENTATIVE ............................................ 35

SECTION 10.7.   TERM OF THE AGREEMENT ....................................................... 35

SECTION 10.8.   BINDING EFFECT .......................................................................... 35

SECTION 10.9.   SURVIVAL OF FEE OBLIGATION ............................................. 35

SECTION 10.10.   FINANCING STATEMENT ........................................................... 35

EXHIBIT A   THE PROJECT ........................................................................... A-1

EXHIBIT B   REQUISITION OF BORROWER ........................................... B-1-1

EXHIBIT C   REQUISITION OF BORROWER ........................................... C-1-1

EXHIBIT D-1   SENIOR PROMISSORY NOTE ............................................. D-1-1

EXHIBIT D-2   SUBORDINATE PROMISSORY NOTE ............................... D-2-1

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| EXHIBIT E | SCHEDULE OF SUBORDINATE BOND REDEMPTION | E-1 |
| EXHIBIT F | DEBT SERVICE PAYMENT SCHEDULES | F-1 |

OH&S DRAFT

An extra section break has been inserted above this paragraph. Do not delete this section break if you plan to add text after the Table of Contents/Authorities. Deleting this break will cause Table of Contents/Authorities headers and footers to appear on any pages following the Table of Contents/Authorities.

## FINANCING AGREEMENT

THIS FINANCING AGREEMENT, dated as of September 1, 2000, between the DIRECTOR OF THE STATE OF NEVADA DEPARTMENT OF BUSINESS AND INDUSTRY, being the duly appointed director of said department (the "Director"), and LAS VEGAS MONORAIL COMPANY, a nonprofit corporation organized under the laws of the State of Nevada, (the "Borrower").

### WITNESSETH:

WHEREAS, the Director of the State of Nevada Department of Business and Industry is the duly appointed director of said department, which is a duly created department in the executive branch of the government of the State of Nevada (the "State"), created and existing under Section 232.510 of the Nevada Revised Statutes, and is authorized pursuant to Sections 349.400 through 349.670, inclusive, of the Nevada Revised Statutes, as supplemented and amended (collectively, the "Act"), to provide financing for certain projects; and

WHEREAS, in furtherance of the purposes of the Act and in order to promote the prosperity, health, safety and welfare of the citizens of the State of Nevada, the Director proposes to finance the cost of the acquisition, construction, improving, and/or equipping of a transportation project (the "Project") more particularly described in Exhibit A hereof; and

WHEREAS, pursuant to and in accordance with the Act, the Director has authorized and undertaken to issue Las Vegas Monorail Project Revenue Bonds 1st Tier Series 2000 ("1st Tier Bonds") and Las Vegas Monorail Project Revenue Bonds 2nd Tier Series 2000 (the "2nd Tier Bonds" and, collectively with the 1st Tier Bonds, the "Senior Bonds") pursuant to a Senior Indenture of even date herewith, between the Director and Wells Fargo Bank, N.A., a national banking association as Trustee (the "Trustee") (the "Senior Indenture") and to issue Las Vegas Monorail Project Revenue Bonds 3rd Tier Series 2000 (the "Subordinate Bonds," and, together with the Senior Bonds, the "Bonds") pursuant to the terms of that certain Subordinate Indenture (the "Subordinate Indenture"), of even date herewith between the Director and the Trustee, in order to provide funds to finance the cost of acquiring, constructing, improving and/or equipping the Project; and

WHEREAS, the Director has undertaken to finance the cost of the acquisition, construction, improving and/or equipping of the Project by making loans of the proceeds derived from the sale from time to time of the Senior Bonds and the Subordinate Bonds to the Borrower pursuant to this Agreement, under which the Borrower is required to make loan payments sufficient to pay when due the principal of, premium, if any, and interest on the Bonds and related expenses; and

WHEREAS, the Borrower has delivered or will deliver to the Director its Notes, in the form of Exhibits D-1 (the "Senior Note") and D-2 (the "Subordinate Note") attached hereto, (collectively, the "Notes") as evidence of its obligations hereunder; and

WHEREAS, it has been determined that the estimated amount necessary to finance the cost of the acquisition, construction, improving and/or equipping of the Project, including necessary expenses incidental to the issuance of the Bonds, will require the issuance,

sale and delivery of the Bonds in an aggregate amount and Initial Denominational Amount, as appropriate, not to exceed $649,148,217.30, as hereinafter provided; and

NOW, THEREFORE, for and in consideration of the premises and the material covenants hereinafter contained, the parties hereto hereby formally covenant, agree and bind themselves as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.1.    DEFINITION OF TERMS.    Unless the context otherwise requires, the terms used in this Agreement shall have the meanings specified in Section 1.01 of the Senior Indenture, or, if not defined therein, in the Subordinate Indenture, as originally executed or as it may from time to time be supplemented or amended as provided therein.    As used in this Agreement, the term "Trustee" refers to Wells Fargo Bank, N.A. (or any successor thereto) in its capacity as Trustee under either or both the Senior Indenture and the Subordinate Indenture, as the context requires. If for any reason the same banking or trust company is not the trustee under both such indentures, the term as used in this Agreement shall refer to the respective trustees under the respective indentures as the context may require.

SECTION 1.2.    NUMBER AND GENDER.    The singular form of any word used herein, including the terms defined in Section 1.01 of the Senior Indenture, and Section 1.01 of the Subordinate Indenture, shall include the plural, and vice versa.  The use herein of a word of any gender shall include all genders.

SECTION 1.3.    ARTICLES, SECTIONS, ETC.    Unless otherwise specified, references to Articles, Sections and other subdivisions of this Agreement are to the designated Articles, Sections and other subdivisions of this Agreement as amended from time to time. The words "hereof," "herein," "hereunder" and words of similar import refer to this Agreement as a whole.  The headings or titles of the several articles and sections, and the table of contents appended to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction or effect of the provisions hereof.

## ARTICLE II

## REPRESENTATIONS

SECTION 2.1.    REPRESENTATIONS OF THE DIRECTOR.    The Director makes the following representations as the basis for its undertakings herein contained:

(a)    The Director is the duly appointed Director of the Department of Business and Industry, a duly created department in the executive branch of the government of the State duly organized and existing under Section 232.510 of the Nevada Revised Statutes. Under the provisions of the Act, the Director has the power to enter into the transactions contemplated by this Agreement and the Senior Indenture and the Subordinate Indenture and to carry out its obligations hereunder.  The Project constitutes and will constitute a "project" as that term is defined in the Act. ·By proper action, the Director has been duly authorized to execute, deliver

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

and duly perform its obligations under this Agreement and the Senior Indenture and the Subordinate Indenture.

(b)     The Senior Bonds will be issued under and secured by the Senior Indenture, pursuant to which the Director's interest in this Agreement with respect to the Senior Bonds (except certain rights of the Director to payment for expenses and indemnification) will be pledged to the Trustee as security for payment of the principal of, premium, if any, and interest on the Senior Bonds as provided therein.

The Subordinate Bonds will be issued under and secured by the Subordinate Indenture, pursuant to which the Director's interest in this Agreement with respect to the Subordinate Bonds (except certain rights of the Director to payment for expenses and indemnification) will be pledged to the Trustee, subject to the rights of the Senior Bonds, as security for payment of the principal of, premium, if any, and interest on the Subordinate Bonds as provided therein.

(c)     All Revenues to be derived by the Director under this Agreement and the rights of the Director hereunder and under the Notes (except for indemnification rights and the rights of the Director to receive fees and reimbursement of its expenses and to receive notices) have been assigned to the Trustee pursuant to the Senior Indenture and the Subordinate Indenture to provide for the payment of the respective series of Bonds. The Director has not pledged and will not pledge any interest in this Agreement or in the Notes for any purpose other than to secure the Bonds under the Senior Indenture and the Subordinate Indenture.

(d)     All public hearings by, authorizations, consents, and approvals of, and registrations or filings with, governmental bodies or agencies (other than approvals which might be required under the securities laws of any jurisdiction) required for the delivery, issuance and sale of the Bonds and the execution and delivery of this Agreement and the Senior Indenture and the Subordinate Indenture, or in connection with the carrying out by the Director of the obligations hereunder and thereunder, have been obtained or made and are in full force and effect.

(e)     The Director has found and determined and hereby finds and determines that all requirements of the Act with respect to the issuance of the Bonds and the execution of this Agreement have been complied with and that issuing the Bonds and entering into this Agreement will be in furtherance of the purposes of the Act.

(f)     The Director makes no representation or warranty concerning the suitability of the Project for the purpose for which it is being undertaken by the Borrower, the feasibility of the Project or the creditworthiness of the Borrower. Any bond purchaser, assignee of this Agreement or any other party with any interest in this transaction shall make its own independent investigation as to the creditworthiness and feasibility of the Project, independent of any representation or warranties of the Director.

SECTION 2.2.     REPRESENTATIONS OF THE BORROWER. The Borrower makes the following representations as the basis for its undertakings herein contained:

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

     (a)     The Borrower has full legal right, power and authority under the laws of the United States and the State of Nevada (i) to enter into the Borrower Loan Documents, (ii) to agree to be bound by the terms of the Senior Indenture and the Subordinate Indenture, (iii) to perform its obligations hereunder and thereunder, and (iv) to consummate the transactions contemplated by the Borrower Loan Documents.

     (b)     The Borrower Loan Documents have been duly executed and delivered by the Borrower and each constitutes a legal, valid and binding obligation of the Borrower, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws or judicial decisions affecting the rights of creditors generally and by judicial discretion in the exercise of equitable remedies. Upon the execution and delivery thereof, each of the Borrower Loan Documents will constitute valid and binding obligations of the Borrower, enforceable in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws or judicial decisions affecting creditors' rights generally and by judicial discretion in the exercise of equitable remedies.

     (c)     The execution and delivery of Borrower Loan Documents and the performance by the Borrower of its obligations thereunder and the consummation of the transactions contemplated thereby will not violate any law, regulation, rule or ordinance or any order, judgment or decree of any federal, state or local court and (with due notice or the passage of time, or both), do not conflict with, or constitute a breach of, or a default under, or result in the creation or imposition of any prohibited lien, charge or encumbrance whatsoever upon any of the property or assets of the Borrower under the terms of any document, instrument or commitment to which the Borrower is a party or by which the Borrower or any of its property is bound.

     (d)     Neither the Borrower nor any of its business or properties, nor any relationship between the Borrower or any other person, nor any circumstances in connection with the execution, delivery and performance by the Borrower of the Borrower Loan Documents or the offer, issue, sale or delivery by the Director of the Bonds, is such as to require the consent, approval or authorization of, or the filing, registration or qualification with, any governmental authority on the part of the Borrower other than those already obtained and state "Blue Sky" laws.

     (e)     The Borrower has not been served with and, to the knowledge of the Borrower, other than as disclosed in the Official Statement, there is no action, suit, proceeding, inquiry or investigation by or before any court, governmental agency or public board or body pending or threatened against the Borrower which (i) affects or seeks to prohibit, restrain or enjoin the issuance, sale or delivery of the Bonds or the loaning of the proceeds of the Bonds to the Borrower or the execution and delivery of the Borrower Loan Documents, (ii) affects or questions the validity or enforceability of the Borrower Loan Documents, (iii) questions the power or authority of the Borrower to carry out the transactions contemplated by, or to perform its obligations under the Borrower Loan Documents or the powers of the Borrower to own, acquire or lease the Project, or (iv) which, if adversely determined, would materially impair its right to carry on business substantially as now conducted or as now contemplated to be conducted, or would materially adversely affect its financial condition.

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

(f)     The Borrower is not in default under any document, instrument or commitment to which the Borrower is a party or to which it or any of its property is subject which default would or could affect the ability of the Borrower to carry out its obligations under the Borrower Loan Documents.

(g)     Any certificate signed by the Borrower or an Authorized Representative of the Borrower and delivered pursuant to the Borrower Loan Documents or the Senior Indenture or the Subordinate Indenture shall be deemed a representation and warranty by the Borrower to the Director and the Trustee as to the statements made therein.

(h)     The information contained in the Official Statement which pertains to the Borrower and the Project is true and correct and accurately summarizes the matters encompassed thereby to the extent such matters are described therein.

(i)     The Cost of the Project is as set forth in the Tax Certificate and has been determined in accordance with sound engineering/construction and accounting principles. All the information and representations in the Tax Certificate are true and correct as of the date thereof.

(j)     The Project consists and will consist of those facilities described in Exhibit A and the Borrower shall not make any changes to the Project or to the operation thereof which would affect the qualification of the Project under the Act or impair the exemption from federal income taxation of the interest on the Bonds. In particular, the Borrower shall comply with all requirements set forth in the Tax Certificate.

(k)     The Borrower has title, easements, rights of way and similar property rights in and to the Project sufficient to carry out the purposes of this Agreement.

(l)     To the knowledge of the Borrower, no member, officer or other official of the Department of Business and Industry or the Director has any financial interest whatsoever in the Project.

(m)     No event has occurred and no condition exists which would constitute a Loan Default Event or which, with the passing of time or with the giving of notice or both would become such a Loan Default Event.

(n)     The Project Agreements are sufficient for the acquisition, construction, installation, operation and maintenance of the Project in accordance with the Agreement, applicable law and prudent industry standards.

ARTICLE III

COMPLETION OF THE PROJECT, SECURITY INTEREST,
ISSUANCE OF THE BONDS

SECTION 3.1.    COMPLETION OF PROJECT; BEST EFFORTS; SECURITY INTEREST. (a) Except as provided below, the Borrower has or will acquire, construct, install and equip the Project or have or will cause the Project to be acquired, constructed, installed and

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

equipped in accordance with the Project Agreements and as herein provided, and will use its best efforts to cause the acquisition, construction, installation and equipping thereof to be completed with all reasonable dispatch.

Anything in this Agreement to the contrary notwithstanding, the Borrower shall not be obligated to complete the acquisition, construction, installation and equipping of the Project upon the payment in full of the unpaid portion of the loan payments due pursuant to this Agreement and the making of all payments in the amount required by, and in accordance with the terms of, this Agreement.

In order to effectuate the purposes of this Agreement, the Borrower will make, execute, acknowledge and deliver, or cause to be made, executed, acknowledged and delivered, all contracts, orders, receipts, writings and instructions, in the name of the Borrower or otherwise, with or to other persons, firms or corporations, and in general do or cause to be done all such other things as may be requisite or proper for the acquisition, construction, installation, and equipping of the Project and fulfillment of the obligations of the Borrower under this Agreement.

The Borrower will maintain such records in connection with the Cost of the Project as to permit ready identification thereof.

(b)     As security for the payment of any and all amounts due hereunder, the Borrower hereby grants, assigns and pledges to the Director a security interest in all of the Borrower's right, title and interest in, to and under the following (hereafter, the "Collateral"): (i) contract rights of the Borrower under the Purchase Agreement, the Design-Build Agreement, the Operation and Maintenance Agreement, the Management Agreement, and the Franchise Agreement and any amendment or successor agreement thereto, (ii) the Net Project Revenues, and (iii) all amounts held in any funds or accounts created under the Senior and Subordinate Indentures or this Agreement (except the Rebate Fund and the Indemnification Account of the Contingency Fund), whether now owned by the Borrower or hereinafter acquired and whether now existing or hereinafter coming into existence and all money, deposits, funds and balances, whether or not evidenced by any certificates of deposit, passbooks or other documents and all revenues, income, interest, dividends, issues and profits added to, earned or accrued on any deposit of the Net Project Revenues; and all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing.

SECTION 3.2.     ISSUANCE OF BONDS.   In order to provide funds for payments of the Cost of the Project, the Director, from time to time, after the execution of this Agreement, will issue the Senior Bonds and the Subordinate Bonds in multiple Series, and deposit or cause to be deposited the proceeds thereof with the Trustee, as provided in the Senior Indenture and the Subordinate Indenture. Prior to delivery of each Series of Senior Bonds or

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

Subordinate Bonds, the Borrower will deliver a written request to the Director to issue such Bonds, and will execute and deliver a Promissory Note relating to the loan represented by such Series of Bonds, in a form attached hereto as Exhibit D hereto.

SECTION 3.3.   REQUISITION   FOR   CONSTRUCTION   FUND, CONTINGENCY FUND, COSTS OF ISSUANCE FUND.  The Director has, in the Senior Indenture and the Subordinate Indenture, authorized and directed the Trustee to make payments from the Construction Fund created under the Senior Indenture and from the Contingency Fund to pay the Cost of the Project and from the Costs of Issuance Fund created under the Senior Indenture to pay Costs of Issuance upon receipt by the Trustee of requisitions in the forms attached hereto as Exhibit B and Exhibit C (upon which the Director and the Trustee shall rely and shall be protected in relying) signed by the Authorized Representatives of the Borrower (who is not required to be an employee of the Borrower).  In each requisition the Borrower shall state, with respect to each payment to be made:  (1) the requisition number, (2) the name and address of the Person to whom payment is due or, in the event such payment is to reimburse the Director or the Borrower, the name and address of the Person to whom payment previously has been made (or, in the case of payments to the Revenue Fund, instructions to make such payments to the Revenue Fund for the payment of interest), (3) the amount to be paid, (4) that there has been no Loan Default Event under this Agreement or that the items to be paid were completed prior to the giving of written notice to the Contractor of the occurrence of such Loan Default Event, (5) that each obligation, item of cost or expense mentioned therein has been properly incurred, is a proper charge against the Construction Fund, Contingency Fund, or Costs of Issuance Fund and has not been the basis of any previous withdrawal, (6) with respect to a requisition for amounts from the Construction Fund or Contingency Fund, a certificate from the Independent Engineer to the effect that such costs are for Cost of the Project, and (7) with respect to payments from the Contingency Fund, and if required by Section 3.03 of the Indenture, approved in writing by the Director.  The Borrower shall retain copies of such requisitions for as long as required by the Tax Certificate.  The Borrower agrees to comply with the provisions of Section 3.14.5 of the Design-Build Agreement.

SECTION 3.4.   REVISIONS TO PLANS AND SPECIFICATIONS.   The Borrower may revise the Plans and Specifications at any time and from time to time prior to the completion of the Initial Project. No change in the Plans and Specifications which will change the route, access points, or station location or orientation of the Initial Project from the route, access points or station location or orientation contemplated at the time of the approval by the Director of the Bonds shall be made unless (i) such change is permitted under the Project Agreements; (ii) the Initial Project as modified by the revised Plans and Specifications is eligible for financing under the Act, (iii) delivery of documents and opinions regarding the Tax-Exempt status of interest on the Bonds required by the Tax Certificate, (iv) the Borrower certifies to the Trustee and the Director, confirmed by the Independent Engineer, that sufficient funds remain on deposit in the Construction Funds created under the Senior Indenture and/or the Subordinate Indenture and the Contingency Fund to pay for such change and/or other provisions have been made to pay for such changes, and (v) the prior written consent of the Insurer has been received. If the conditions in the previous sentence are met, the Borrower and the Director shall modify Exhibit A to this Agreement in accordance with such changes.  Upon written request, the Borrower shall promptly provide copies of such changes to the Director.

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

SECTION 3.5.   CERTIFICATE OF COMPLETION.   The Borrower shall provide the Trustee and the Director with a copy of the Certificate of Final Acceptance of the Borrower as defined in the Design-Build Agreement simultaneously with delivery of such Certificate pursuant to Article 20 thereof. Notwithstanding the foregoing, such certificate shall state that it is given without prejudice to any rights against third parties which exist at the date thereof or which may subsequently come into being.

SECTION 3.6.   COMPLETION OF PROJECT IF BOND PROCEEDS INSUFFICIENT; SURPLUS PROCEEDS. If the moneys in the Construction Fund and Contingency Fund available for payment of the Cost of the Project are not sufficient to pay the Cost of the Project in full, the Borrower will complete or cause to be completed the Project, and the Borrower will pay or cause to be paid all of that portion of the Cost of the Project in excess of the moneys available therefor in the Construction Fund and Contingency Fund. THE DIRECTOR DOES NOT MAKE ANY WARRANTY, EITHER EXPRESS OR IMPLIED, THAT THE MONEYS WHICH WILL BE PAID INTO THE CONSTRUCTION FUND AND/OR CONTINGENCY FUND WILL BE SUFFICIENT TO PAY THE COST OF THE PROJECT. If the Borrower shall pay any portion of the Cost of the Project pursuant to the provisions of this Section 3.6, it shall not be entitled to any reimbursement therefor from the Director, the Trustee, the Bond Registrar, the Paying Agent, or the Bondholders, nor shall it be entitled to any diminution in or postponement of the loan payments required to be paid by the Borrower or the Administrative Fees and Expenses.

If, upon the Completion Date, there shall be any surplus funds remaining in the Construction Fund and/or the Contingency Fund after payment or application of all amounts owed under the Design-Build Agreement not reserved to pay for the Cost of the Project, such funds shall be deposited in the General Fund upon delivery of written instructions from the Borrower to the Trustee.

SECTION 3.7.   DEFAULT BY CONTRACTORS.   In the event of default under the Design-Build Agreement or the Operation and Maintenance Agreement, or any other material contract made by the Borrower in connection with the acquisition, construction, installation, equipping, maintenance, or operation of the Project or in the event of a breach of warranty with respect to any materials, workmanship or performance guaranty, the Borrower shall proceed, either separately or in conjunction with others, to pursue such remedies against the contractor so in default and against each surety for the performance of such contract as it may deem advisable. Any amounts recovered by way of damages, refunds, adjustments or otherwise in connection with the foregoing prior to the Completion Date shall, to the extent not otherwise directed by the Project Agreements be paid into the Construction Fund or, if recovered after the Completion Date and full disposition of the Construction Fund, shall be paid into the Collection Fund.

SECTION 3.8.   CHANGE ORDERS. The Borrower shall deliver to the Insurer a copy of each change order issued under Section 13.2 of the Design-Build Agreement (a "Change Order"). Each Change Order initiated under Section 13.2 of the Design-Build Agreement must contain, unless otherwise consented to by the Insurer, the following:

8

Monorail Financing Agreement

(a) an agreement by the Contractors to the adjustment, if any, of the Guaranteed Completion Date (as that term is defined in the Design-Build Agreement);

(b) a certification by the Borrower that such change in the Guaranteed Completion Date, if any, will not extend the Guaranteed Completion Date beyond the date funds are available in the 1st Tier Capitalized Interest Subaccount (established pursuant to Section 3.02 of the Indenture) to pay interest on the 1st Tier Series 2000 Bonds; and

(c) a certification by the Borrower that in its reasonable judgment the sum of (1) the amount of funds remaining in the Construction Fund and the Contingency Fund, (2) the amount of Additional Debt permitted under Section 5.6(h) hereof, and (3) any Deferred Payment Obligations that are permitted under the Design-Build Agreement, together with a reasonable estimate of earnings to be received thereon or therein, is not less than the amount required to complete and pay for the acquisition and construction of the Project.

SECTION 3.9.    LIMITATION OF DIRECTOR'S LIABILITY.    Anything contained in this Agreement to the contrary notwithstanding, any obligation the Director may incur in connection with the undertaking of the Project for the payment of money shall not be deemed to constitute a debt or general obligation of the Director, the State or any political subdivision thereof, but shall be payable solely from the revenues and receipts received by it under this Agreement. No provision in this Agreement or any obligation herein imposed upon the Director, or the breach thereof, shall constitute or give rise to or impose upon the Director, the State or any political subdivision thereof a pecuniary liability or a charge upon its general credit or taxing powers. Neither the Director nor any officer or members of the State of Nevada Department of Business and Industry shall be personally liable on this Agreement.

ARTICLE IV

LOANS OF PROCEEDS; DEPOSITS TO TRUSTEE; REPAYMENT PROVISIONS

SECTION 4.1.    LOAN OF BOND PROCEEDS; ISSUANCE OF BONDS. (a) The Director covenants and agrees, upon the terms and conditions in this Agreement, to make a loan to the Borrower for the purpose of financing a portion of the Cost of the Project. Pursuant to said covenant and agreement, the Director will issue the Bonds from time to time upon the terms and conditions contained in this Agreement and the Senior Indenture and Subordinate Indenture, and will cause the Bond proceeds to be applied as provided in Article III of each such Indenture. Delivery of the Subordinate Bonds, 3rd Tier Series 2000A and 2000B shall be made in consideration of the performance by the Contractor of their obligations under the Design-Build Agreement, and the Initial Denominational Amount of those series of Subordinate Bonds will be deemed to be loaned to the Borrower.

(b)    The Borrower shall establish and maintain the Collection Fund. Except as provided below, upon receipt, all Project Revenues shall be deposited in the Collection Fund. Moneys in the Collection Fund shall be disbursed as follows in the following order of priority:

Monorail Financing Agreement

(i)     from time to time, up to and including the last Business Day of each month, the Borrower shall reserve for payment and shall pay from the Collection Fund all amounts required to pay Operation and Maintenance Costs; and

(ii)    on the last Business Day of each month, after making all payments required by subparagraph (i), the Borrower shall transfer Net Project Revenues (A) to the Trustee sufficient to pay all 1st Tier Loan Repayments and other payments required to make all deposits under Section 5.03(a)-(b) of the Senior Indenture for the next month, and (B) to any Other Lender of any 1st Tier Parity Debt the amounts required to be paid for the next month as debt service on the 1st Tier Parity Debt or required to be deposited in the respective debt service reserve fund for such 1st Tier Parity Debt. If the Borrower cannot make the full payment required by this subparagraph (ii), the Borrower shall transfer all remaining funds on a pari passu basis to the Trustee for deposit in the Revenue Fund and to the Other Lenders in proportion to the 1st Tier Parity Debt held by such Other Lenders of as may be required by any applicable intercreditor agreement by and among the Trustee and such Other Lenders.

(iii)   on the last Business Day of each month, after making all payments and transfers required by subparagraphs (i) and (ii), the Borrower shall transfer Net Project Revenues (A) to the Trustee sufficient to pay all 2nd Tier Loan Repayments and other payments required to make all deposits under Section 5.03 (c)-(d) of the Senior Indenture for the next month, and (B) to any Other Lender of any 2nd Tier Parity Debt the amounts required to be paid for the next month as debt service on the 2nd Tier Parity Debt or required to be deposited in the respective debt service reserve fund for such 2nd Tier Parity Debt. If the Borrower cannot make the full payment required by this subparagraph (iii), the Borrower shall transfer all remaining funds on a pari passu basis to the Trustee for deposit in the Revenue Fund and to the Other Lenders in proportion to the 2nd Tier Parity Debt held by such Other Lenders.

(iv)    after making the payments and transfers required by subparagraphs (i)-(iii) above, the Borrower shall transfer Net Project Revenues to the Trustee sufficient to make all deposits under Section 5.03(e) of the Senior Indenture and Section 5.03(b) of the Subordinate Indenture for the next month.

(v)    after making the payments and transfers required by subparagraphs (i)-(iv) above, the Borrower shall pay from Net Project Revenues all Deferred Progress Payment Obligations if and to the extent required under Sections 12.5.1 and 12.5.3 of the Design-Build Agreement.

(vi)    after making the payments and transfers required by subparagraphs (i)-(v) above, the Borrower shall pay from Net Project Revenues all Incentive Payments if and to the extent required under Sections 12.3.1 and 12.3.2 of the Design-Build Agreement.

Notwithstanding the foregoing, upon (x) the end of the sixth consecutive month in which the Borrower has not collected Net Project Revenues in the amounts required by Section 5.8(a) hereof or (y) failure by the Borrower to make a payment required by Section 4.2(a)(i) hereof, the Borrower shall notify the Trustee in writing of such occurrence. Thereafter, the Borrower shall within seven days transfer the balance in the Collection Fund to the Trustee for deposit in the Revenue Fund, and promptly upon receipt, transfer all Project

10                                          Monorail Financing Agreement

DOCSSF1:776763
40476-110 RIH

Revenues to the Trustee for deposit in the Revenue Fund, and thereafter all payments permitted or required to be paid from the Collection Fund for Operation and Maintenance shall be paid by the Trustee from the Revenue Fund upon written direction of the Borrower. If the Borrower subsequently operates the Project to generate Net Project Revenues in the amounts required by Section 5.8(a) hereof and makes all payments required by Section 4.2(a)(i) hereof when due for a period of twelve consecutive months, the Borrower may, upon written notice to the Trustee, retain Project Revenues in the Collection Fund and expend funds as described in the preceding paragraph.

(c)     The Borrower shall establish and maintain the Capital Replacement Fund as provided in Section 4.1(e). After making the payments required by subsection (b) or upon receipt of moneys from the Revenue Fund from the Trustee, on the last Business Day of each month the Borrower shall transfer from the Collection Fund into the Capital Replacement Fund any and all amounts required by the Annual Budget to be applied or reserved in the next month for Capital Replacement Costs. Such funds shall be used by the Borrower only to fund Capital Replacement Costs or, at the Borrower's option, to make any payments required under Section 4.1(b).

(d)     (I) The Borrower shall establish and maintain the General Fund as provided in Section 4.1(f) hereof. The Borrower will establish and maintain within the General Fund two Subaccounts entitled the "1st Tier General Fund Subaccount" and the "2nd Tier General Fund Subaccount." After making payments and transfers required by paragraphs (b)-(c) above, or upon receipt of moneys from the Trustee, on the last Business Day of each month, the Borrower shall transfer sixty percent (60%) of the remaining Net Project Revenues from the Collection Fund to the 1st Tier General Fund Subaccount until the balance on deposit in such subaccount reaches $30,000,000, and forty percent (40%) of the remaining Net Project Revenues from the Collection Fund to the 2nd Tier General Fund Subaccount until the balance on deposit in such subaccount reaches $20,000,000. If either the 1st Tier General Fund Subaccount or the 2nd Tier General Fund Subaccount become fully funded in accordance with the preceding sentence, one hundred percent (100%) of the remaining Net Project Revenues from the Collection Fund shall be transferred to the Subaccount in the General Fund which has not yet been fully funded.

Notwithstanding the foregoing, upon (x) the end of the sixth consecutive month in which the Borrower has not collected Net Project Revenues in the amounts required by Section 5.8(a) hereof or (y) failure by the Borrower to make a payment required by Section 4.2(a)(i) hereof, the Borrower shall notify the Trustee in writing of such occurrence. Thereafter, the Borrower shall within seven days transfer the General Fund to the control of the Trustee, and thereafter all payments permitted or required to be paid from the General Fund as provided herein shall be paid by the Trustee upon written direction of the Borrower. If the Borrower subsequently operates the Project to generate Net Project Revenues in the amounts required by Section 5.8(a) hereof and makes all payments required by Section 4.2(a)(i) hereof when due for a period of twelve consecutive months, the Trustee will, upon written notice to such effect from the Borrower, return the General Fund to the Borrower and the Borrower may thereafter retain and expend funds as described in the preceding paragraph.

DOCSSFI:477676.3
40476-110 RIH

Monorail Financing Agreement

(II) All money in the 1st Tier General Fund Subaccount shall be set aside by the Borrower and shall be applied, used and withdrawn only for the following purposes in the following order:

(i)   to pay Operation and Maintenance Costs;

(ii)  to pay 1st Tier Parity Debt; or

(iii) to replenish the 1st Tier Debt Service Reserve Fund or the respective debt service reserve fund created with respect to 1st Tier Parity Debt.

The Borrower shall apply the moneys in the 1st Tier General Fund Subaccount to the maximum extent possible prior to allowing the Trustee to use moneys in the 1st Tier Debt Service Reserve Fund.

(III) All money in the 2nd Tier General Fund Subaccount will be set aside by the Company and will be applied, used and withdrawn only for the following purposes in the following order:

(i)   to pay Operation and Maintenance Costs;

(ii)  to pay 2nd Tier Parity Debt; or

(iii) to replenish the 2nd Tier Debt Service Reserve Fund or the respective debt service reserve fund created with respect to 2nd Tier Parity Debt.

The Borrower shall apply the moneys in the 2nd Tier General Fund Subaccount to the maximum extent possible prior to allowing the Trustee to use moneys in the 2nd Tier Debt Service Reserve Fund.

(IV) If at any time (i) the balance on deposit in the 1st Tier General Fund Subaccount exceeds $30,000,000 and the balance on deposit in the 2nd Tier General Fund Subaccount exceeds $20,000,000, (ii) all funds and accounts created hereunder and under the Senior Indenture are and have been funded in the proper amounts as required by this Agreement and the Senior Indenture (recognizing permissible use of the Debt Service Funds to pay 1st Tier Debt Service and 2nd Tier Debt Service and of the Capital Replacement Fund to pay Capital Replacement Costs, respectively), (iii) the Borrower has reasonably concluded that the Borrower will meet the requirements of Section 5.8(a)(i) and (ii) hereof as of the last day of the current Fiscal Year, and (iv) no Loan Default Event under Section 7.01(a) has occurred and is continuing, then all Excess Net Project Revenues shall be applied (x) first to the payment of Deferred Incentive Payment Obligations if and to the extent required under Section 12.5.3 of the Design-Build Agreement, if any, (y) second, to the payment of scheduled Subordinate Debt Service, and (z) thereafter, to the prepayment of Outstanding Subordinate Debt; in each case so long as such payments otherwise comply with the terms hereof and the Senior Indenture and Subordinate Indenture. Notwithstanding the previous sentence, the Borrower may not cause the prepayment of Subordinate Bonds in any Fiscal Year in an amount greater than is set forth in Exhibit E hereto, provided that the Borrower may cause the prepayment of the Subordinate Bonds in full at any time, with the consent of the Insurer, in connection with the issuance of

12

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

Additional Debt. Any moneys to be used for the purposes of subparagraphs (y) and (z) above shall be transferred to the Trustee under the Subordinate Indenture, and, with respect to payments of scheduled Subordinate Debt Service, shall be deemed to be the payments required under Section 4.2(a)(ii) hereunder. When there are no longer any Subordinate Bonds or Deferred Incentive Payment Obligations outstanding, Excess Net Project Revenues may be used for any lawful corporate purpose of the Borrower. If there are Excess Net Project Revenues but one or more of the conditions of this section are not met to allow the disbursement of such moneys, or Excess Net Project Revenues cannot be used to prepay additional Subordinated Bonds, they will be retained in the General Fund, on the basis of 60% to the 1st Tier Subaccount and 40% to the 2nd Tier Subaccount.

(e)    Moneys in the General Fund, the Capital Replacement Fund, Collection Fund, the Construction Fund, the Contingency Fund, and any other fund created hereunder or under the Senior Indenture or the Subordinate Indenture shall be invested in Investment Securities maturing not later than the date on which it is estimated that such moneys will be required for the purposes specified in this Agreement. All interest, profits, and other income received from the investment of moneys in the General Fund, the Capital Replacement Fund, and the Collection Fund shall, prior to the Completion Date, be deposited in the Construction Fund, or, after the Borrower has delivered the certificate of completion described in Section 3.5, in the Collection Fund. All interest, profits and other income received from the investment of moneys in such other funds established pursuant to the Indenture shall be deposited as provided in Section 5.05 of the Senior Indenture and Section 5.05 of the Subordinate Indenture. Notwithstanding anything to the contrary contained in this paragraph, an amount of interest received with respect to any Investment Security equal to the amount of accrued interest, if any, paid as part of the purchase price of such Investment Security shall be credited to the fund from which such accrued interest was paid. For the purpose of determining the amount in the above funds, all Investment Securities credited to such fund shall be valued at the fair market value thereof plus, prior to the first payment of interest following purchase, the amount of accrued interest, if any, paid as a part of the purchase price.

(f)    The Borrower hereby covenants to and shall at all times maintain the Collection Fund, the Capital Replacement Fund, and the General Fund with a bank, having (or in the case of a bank included in a bank holding company system, the related bank holding company having) a combined capital and surplus of at least one hundred million dollars ($100,000,000), and subject to supervision or examination by federal or state regulators. If such bank publishes a report of condition at least annually, pursuant to law or to the requirements of any supervising or examining regulators above referred to, then for the purpose of this subsection the combined capital and surplus of such bank shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. The Borrower shall provide, or cause such bank to provide, at least monthly, statements of account for each of the Collection Fund, the Capital Replacement Fund, Operating Reserve Fund, and the General Fund to the Director.

SECTION 4.2.    DEPOSITS TO TRUSTEE; REPAYMENT AND PAYMENT OF OTHER AMOUNTS PAYABLE. (a) (i) Senior Loan Repayments. On or before the last Business Day of each month, until the principal, denominational amount, or Accreted Value of, premium, if any, and interest on the Senior Bonds shall have been fully paid or provision for

13

Monorail Financing Agreement

such payment shall have been made as provided in the Senior Indenture, the Borrower covenants and agrees to pay to the Trustee as a repayment on the loan made to the Borrower from Senior Bond proceeds pursuant to Section 4.1 hereof, a sum equal to one-sixth of the interest and one-twelfth of the principal due on the next Bond Payment Date as principal or Accreted Value of and premium, if any, and interest on the Senior Bonds, as listed in Exhibit F hereto, and amounts required, if any, for deposits into the Revenue Fund and Debt Service Reserve Funds as provided in the Senior Indenture. Such Loan Repayments shall be made in federal funds or other immediately available funds current at the principal office of the Trustee. Notwithstanding the foregoing, for as long as moneys on deposit in the Capitalized Interest Fund are sufficient to pay interest on the Senior Bonds, the Borrower shall not be required to make payments under this Section 4.2(a)(i) with respect to interest on the Senior Bonds.

(ii)     Subordinate Loan Repayments.  On or before the last Business Day prior to any Bond Payment Date for the Subordinate Bonds, until the denominational amount, Accreted Value of, and premium, if any, on the Subordinate Bonds shall have been fully paid or provision for such payment shall have been made as provided in the Subordinate Indenture, the Borrower covenants and agrees to pay to the Trustee under the Subordinate Indenture as a repayment on the loan made to the Borrower from Subordinate Bond proceeds pursuant to Section 4.1 hereof, a sum equal to the Accreted Value or other amount due on such Bond Payment Date with respect to the Subordinate Bonds and premium and interest, if any, on the Subordinate Bonds as provided in the Subordinate Indenture.  Such Subordinate Loan Repayments shall be made in federal funds or other immediately available funds current at the principal office of the Trustee.

(iii)     Payments made pursuant to this Section 4.2(a) shall at all times be sufficient to pay the total amount of interest and principal or Accreted Value (whether at maturity or upon redemption or acceleration) and premium, if any, becoming due and payable on the Senior Bonds and Subordinate Bonds on each Bond Payment Date relating to such Bonds; provided that on January 1 of each year, any amount held by the Trustee in the Revenue Funds under the Senior Indenture and Subordinate Indenture on the due date for a Loan Repayment hereunder shall be credited against the installment due on such date to the extent available for such purpose under the terms of the corresponding Indenture.  Notwithstanding the foregoing, if on any date the amounts held by the Trustee in the corresponding Revenue Funds are insufficient to make any required payments of principal or Accreted Value of (whether at maturity or upon redemption or acceleration) and interest and premium, if any, on the Bonds as such payments become due, the Borrower shall forthwith pay such deficiency as a Loan Repayment hereunder and such funds shall be applied as provided in the Senior Indenture, in the case of payments relating to the Senior Bonds, or the Subordinate Indenture, in the case of payments relating to the Subordinate Bonds.

(b)     The Borrower also agrees to pay (i) the annual fee of the Trustee for its reasonable and ordinary services rendered as trustee, and its reasonable and ordinary expenses incurred under the Senior Indenture and Subordinate Indenture, as and when the same become due and upon demand therefor, in accordance with the written agreements approved by the Borrower, (ii) the reasonable fees, charges and expenses (including reasonable legal fees and expenses) of the Trustee, as bond registrar and paying agent, and the reasonable fees of any other paying agent on the Bonds as provided in the Senior Indenture and Subordinate Indenture, as and

DOCSSF1:477676.3
40476-110 RJH

Monorail Financing Agreement

when the same become due, in accordance with the written agreements approved by the Borrower, (iii) the reasonable fees, charges and expenses of the Trustee for the necessary extraordinary services rendered by it and extraordinary expenses incurred by it under the Senior Indenture and Subordinate Indenture, as and when the same become due, (iv) the cost of printing any Bonds required to be furnished by the Director at the expense of the Director, (v) the costs, charges and expenses of the Director incurred in connection with the Director's visit/inspection of the Project pursuant to Section 5.1 hereof, (vi) all other expenses of the Director related to the Project or the Bonds not otherwise expressly required to be paid by the Borrower hereunder and (vii) any amounts required to be deposited in the Rebate Fund to comply with the provisions of Section 5.10 hereof and Section 6.06 of the Senior Indenture and Section 6.06 of the Subordinate Indenture.

(c)     The Borrower also agrees to pay (i) an issuance Fee of $250,000 upon the issuance of the Series 2000 Bonds and (ii) an annual Administrative Fee of $50,000 due on July 1 of each year commencing on the July 1 following delivery of the certificate provided in Section 3.5.

(d)     The Borrower also agrees to pay reasonable fees and expenses of Independent Certified Public Accountants or Independent Engineers necessary for the preparation of annual or other audits, reports or summaries thereof required by the Senior Indenture or Subordinate Indenture or by the Director, including a report of an Independent Certified Public Accountant with respect to any fund established under the Senior Indenture or Subordinate Indenture which may be required by law; any other reasonable fees and expenses of financial analysts or Independent Engineers or others reasonably required to be employed by the Director in connection with the Project or the Bonds.

(e)     In the event the Borrower should fail to make any of the Payments required by subsections (a) through (d) of this Section, such payments shall continue as obligations of the Borrower until such amounts shall have been fully paid. The Borrower agrees to pay such amounts, together with interest thereon until paid, to the extent permitted by law, at the rate of eight percent (8%) per annum following a delinquency of 30 days or longer (or such period in which the Borrower is in good faith contesting the payment thereof), provided that no interest shall be paid on overdue payments under subsection (a)(ii) in the case of any Subordinate Loan Repayments prior to the final maturity of the Subordinate Bonds but such Subordinate Bonds shall continue to accrue interest, until paid, at the same yield as contained in the Accreted Value Table applicable to such Bonds. Interest on overdue payments required under subsection (a) above shall be paid by the Trustee to the Bondholders of the respective Series of Senior Bonds or Subordinate Bonds in proportion to their ownership interests.

(f)     All payments made under this Section 4.2 shall be made pursuant to the provisions of Section 4.1 hereof.

SECTION 4.3.    UNCONDITIONAL OBLIGATION. The obligations of the Borrower to make the payments required by Section 4.2 (a) and (c) hereof and to perform and observe the other agreements on its part contained herein shall be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Director, and during the term of this Agreement, the Borrower shall

15                          Monorail Financing Agreement

pay absolutely net the payments to be made on account of the loan as prescribed in Section 4.2 and all other payments required hereunder, free of any deductions and without abatement, diminution or set-off. Until such time as the principal or Accreted Value of, premium, if any, sinking fund installments, if any, and interest on the Bonds shall have been fully paid, or provision for the payment thereof shall have been made as required by the Senior Indenture and Subordinate Indenture, the Borrower (i) will not suspend or discontinue any payments provided for in Section 4.2 hereof; (ii) will perform and observe all of its other covenants contained in this Agreement; and (iii) except as provided in Article VIII hereof, will not terminate this Agreement for any cause, including, without limitation, failure to complete the Project, the occurrence of any act or circumstances that may constitute failure of consideration, destruction of or damage to the Project, commercial frustration of purpose, any change in the tax or other laws of the United States of America or of the State of Nevada or any political subdivision of either of these, or any failure of the Director or the Trustee to perform and observe any covenant, whether express or implied, or any duty, liability or obligation arising out of or connected with this Agreement or the Senior Indenture and Subordinate Indenture, except to the extent permitted by this Agreement.

SECTION 4.4.    ASSIGNMENT OF DIRECTOR'S RIGHTS.  As security for the payment of the Senior Bonds, the Director will assign to the Trustee the Director's rights under this Agreement, including the right to receive payments hereunder and under the Senior Note, including its rights, as assignee, under the Project Agreements, and as security for the payment of the Subordinate Bonds, the Director will assign to the Trustee the Director's right to receive payments hereunder and under the Subordinate Notes, subordinate to all rights assigned under the Senior Indenture (except, in each case, the right of the Director to receive certain payments, if any, with respect to expenses and indemnification of the Director, or to enforce its rights, under Sections 4.2(b), 4.2(c), 7.3, 9.2 and 9.3 hereof and consent rights of the Director hereunder), and the Director hereby directs the Borrower to make the payments required hereunder (except such payments for expenses and indemnification of the Director) for the Senior Bonds and Subordinate Bonds directly to the Trustee. The Borrower hereby assents to such assignments and agrees to make payments directly to the Trustee without defense or set-off by reason of any dispute between the Borrower and the Director or the Trustee.

SECTION 4.5.    AMOUNTS REMAINING IN FUNDS.  It is agreed by the parties hereto that after payment in full of (i) the Bonds, or after provision for such payment shall have been made as provided in the Senior Indenture and Subordinate Indenture, (ii) the fees, charges and expenses of the Trustee and paying agents in accordance with the Senior Indenture and (iii) all other amounts required to be paid under this Agreement and the Senior Indenture and Subordinate Indenture, any amounts remaining in any fund held by the Trustee under the Senior Indenture and Subordinate Indenture shall be paid to the Borrower.

ARTICLE V

SPECIAL COVENANTS AND AGREEMENTS

SECTION 5.1.    RIGHT OF ACCESS TO THE PROJECT, BOOKS, AND RECORDS.  The Borrower agrees that during the term of this Agreement the Director, the Trustee and the duly authorized agents of either of them (including, but not limited to, the

16                                    Monorail Financing Agreement

Independent Engineer or Independent Certified Public Accountant) shall have the right at all reasonable times upon written notice delivered twenty-four hours prior to such inspection during normal business hours to enter upon the site of the Project to examine and inspect the Project. The Borrower further agrees and understands that the Director will make at least one visit/inspection of the Project during the term of the Bonds at the expense of the Borrower, and the Borrower shall either reimburse the Director or pay in advance the costs, charges and expenses of the Director in connection with any such visit/inspection. The Borrower shall maintain adequate books, accounts and records in compliance with the regulations of any governmental regulatory body having jurisdiction thereof.

SECTION 5.2. MAINTENANCE, OPERATION AND INSURING OF PROJECT; BUDGET; TAXES. (a) Maintenance and Operation of the Project; Budgets. The Borrower will maintain and preserve the Project in good repair and working order at all times and will operate the Project or cause the Project to be operated by a qualified Operator in an efficient, economical and environmentally sound manner and will pay all Operation and Maintenance Costs as they become due and payable. The Project shall be maintained and operated in accordance with the Operation and Maintenance Agreement and the covenants contained in Sections 5.2, 5.5, 5.6, and 5.13 of this Agreement.

Not later than 30 days prior to the beginning of the Fiscal Year, the Borrower will provide to the Director and the Trustee copies of its budget (the "Annual Budget") (which has been reviewed and approved by the Independent Engineer and the Board of Directors of the Borrower) setting forth the estimated Operation and Maintenance Costs and required deposits to the Capital Replacement Fund and the estimated payments for Debt Service and all other necessary costs of the Borrower for such Fiscal Year and take such action, if any, as may be required to comply with the Borrower's obligations under Section 5.8(a). Any such Annual Budget may be amended at any time during any Fiscal Year and the Borrower shall provide a copy of such amendment to the Director and the Trustee promptly after the approval thereof; provided, however, that if such amendments exceed, when aggregated with any other amendments made during such Fiscal Year, 5% of the then-current Annual Budget, such amendment shall be approved by the Independent Engineer. Notwithstanding the foregoing, review by an Independent Engineer is not required for any Fiscal Year if the Borrower has, for each of the prior five (5) consecutive Fiscal Years, (i) collected Net Project Revenues in each Fiscal Year as required by Section 5.8(a) hereof, and (ii) no Loan Default Event has occurred and is continuing. Upon selection of a new Operator under the Operation and Maintenance Agreement, such provisions shall be reinstated for the term of this Financing Agreement for an additional period of five Fiscal Years. Copies of an Annual Budget shall be submitted to the Director or Trustee as soon as practicable after approval. If no budget or any amendment thereto is approved with respect to any Fiscal Year, the prior year's Annual Budget shall remain in effect until approval of a new Annual Budget is obtained as required herein.

(b) Insurance. The Borrower shall maintain or cause to be maintained, throughout the term of this Agreement, such insurance coverages as are required under the Franchise Agreement. Such insurance shall name the Trustee, for the benefit of the Bondholders, as additional payee with respect to insurance proceeds payable to the Borrower. Any such proceeds in the amount of $10,000,000 or more shall be paid to the Trustee for deposit in the Construction Fund. Such moneys shall be disbursed for application toward

Monorail Financing Agreement

extinguishment or satisfaction of the occurrence with respect to which the proceeds of such insurance shall have been paid or as otherwise specifically allowed in Section 6.2 hereof.

(c)   Additional Insurance Provision; Form of Policies. The Borrower shall pay or cause to be paid when due the premiums for all insurance policies required by the terms hereof, and shall promptly furnish or cause to be furnished evidence of such payments to the Trustee. All such policies shall provide that the Trustee shall be given 30 days notice of the expiration thereof, any intended cancellation thereof or any reduction in the coverage provided thereby.

The Borrower shall cause to be delivered to the Trustee and, upon request, the Director, on or before August 15 each year, commencing August 15, 2001, a schedule of the insurance policies being maintained in accordance herewith and a Certificate of the Borrower stating that such policies are in full force and effect and that the Borrower is in full compliance with the requirements of this Article. The Borrower shall, upon request of the Trustee or the Director, deliver certificates or duplicate originals or certified copies of each insurance policy described in such schedule. The Trustee shall be entitled to rely upon said Certificate of the Borrower as to the Borrower's compliance with this Article. Neither the Trustee nor the Director shall be responsible for the sufficiency of coverage or amounts of such policies.

The Borrower shall promptly advise the Director and the Trustee in writing if any change in the insurance coverage occurs and provide on September 1 of each year that any of the Bonds are outstanding a report as to all insurance policies maintained by the Borrower with respect to the Project, including the names of the insurers which have issued the policies and the amounts thereof and the property or risks covered thereby. Such report shall also certify that insurance coverage exists for all risks specified in this Agreement. The Trustee shall not be responsible for the extent of coverage or the adequacy hereof.

(d)   Taxes. The Borrower will pay, or cause to be paid, all taxes levied with respect to the Project and the income therefrom, including any assessments or other public charges secured by liens upon the Project or the Borrower's interests therein.

SECTION 5.3.   MAINTENANCE OF EXISTENCE; QUALIFICATION IN THE STATE. The Borrower agrees that during the term of this Agreement it will remain in good standing and having the capacity to do business in the State and will maintain its existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not combine or consolidate with or merge into another entity or permit one or more other entities to consolidate with or merge into it; provided, however, that the Borrower, upon written notice to the Director 120 days prior to such transfer, and provision of an opinion of Bond Counsel to the Director and the Trustee to the effect that the resulting change in ownership of the Project or disposition of assets will not cause interest on the Bonds not to be Tax-exempt, may so combine, consolidate with, or merge into another entity existing under the laws of one of the states of the United States, or permit one or more other entities to consolidate with or merge into it, or sell or otherwise transfer to another entity all or substantially all of its assets as an entirety and after which it may dissolve, provided that such surviving, resulting or transferee entity, as the case may be, (1) if such entity is not the Borrower, assumes and agrees in writing to pay and perform all of the obligations of the Borrower hereunder and under the Project Agreements, (2) qualifies

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

to do business in the State or is a governmental unit, and (3) will not be in default under any of the Project Agreements or this Agreement. The Borrower shall provide a Certificate of the Borrower to the Director within thirty (30) days after the effective date of such consolidation, merger, sale or transfer of all or substantially all of the assets of the Borrower to such entity stating that all requirements of this Section 5.3 have been satisfied.

SECTION 5.4.   COOPERATION. The Borrower agrees that it will perform on request of the Director such reasonable acts as may be necessary or advisable to carry out the intent of this Agreement or of the Senior Indenture or the Subordinate Indenture.

SECTION 5.5.   COMPLIANCE WITH LAWS; LICENSES. The Borrower agrees that it will at all times comply with, or cause to be complied with, all laws, statutes, rules, regulations, orders and directions of any governmental authority having jurisdiction over the Borrower or its businesses if a breach of any such law, statute, rule, regulation, order, or direction would materially and adversely affect the Project, except where contested in good faith and by proper proceedings. The Borrower shall maintain in full force and effect and comply in all material respects with all licenses, permits, approvals, orders, consents, franchises (including without limitation, the Franchise Agreement) and other governmental authorizations necessary to own and operate the Project and conduct its business.

SECTION 5.6.   FINANCING COVENANTS.   In addition to the other covenants in this Agreement, the Borrower covenants specifically as follows:

(a)   Defense of Title. The Borrower shall warrant, defend and preserve its right, title and interest in and to the Project Revenues, the Project Agreements, and the Collateral and the validity and priority of the lien of this Agreement, shall forever warrant and defend the same against the claims of all persons whomsoever, and the Borrower shall not sell or otherwise alienate any of its interests in the Project, the Project Revenues, the Project Agreements, and the Collateral except as otherwise permitted hereunder.

(b)   Further Assurances. The Borrower shall execute and deliver any further writing, instrument or document and take any further action as may be reasonably requested from time to time by the Director or the Trustee, and in form and substance reasonably satisfactory to the Trustee, and make all recordings and filings and take all such other action as may be necessary or desirable under any applicable law to evidence, effectuate, preserve the priority of, protect and perfect the lien on and security interest in the Collateral, and use its best efforts to comply with any request of the Trustee to obtain, execute, deliver or file nondisturbance agreements, mortgagee's waivers, and such other instruments and notices, amendments and renewals thereof, as the Trustee shall deem appropriate fully to preserve and protect the security interest in the Collateral.

(c)   Recordings and Filings. The Borrower shall cause this Agreement to be filed or recorded in such manner and in such places as may be required by law in order to publish notice of and fully to protect the lien on and security interest in the Collateral and shall execute supplements to this Agreement, financing statements, continuation statements and any other instruments or documents reasonably deemed necessary or desirable to perfect or preserve the security interest in the Collateral. To the extent permitted by law, the Trustee is authorized, but

19

Monorail Financing Agreement

is not obligated, to record and file supplements to this Agreement, financing or continuation statements without the signature of the Borrower to perfect or maintain the lien on and security interest in the Collateral. The Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.

(d)     Notification of Litigation and Adverse Business Development.  The Borrower shall give prompt written notice to the Trustee and the Director of (i) any action, proceeding or investigation in which damages claimed or likely to be claimed in connection therewith exceed $5,000,000 which is pending or, to its knowledge based upon reasonable investigation, threatened against the Borrower before any court or governmental instrumentality or other administrative agency which may involve the Project or the Project Revenues, or (ii) any damage to the Project which has a material adverse effect on the Borrower's ability to pay Senior and Subordinate Loan Repayments or the threat of any condemnation or taking proceeding affecting any material portion of the Project or the Project Revenues. The Borrower agrees to vigorously contest any litigation which could materially affect the Project or the Project Revenues.

(e)     No Encumbrances. The Borrower shall at all times keep the Project, the Project Revenues, the Project Agreements, and the Collateral free of all liens except the security interest granted hereunder or liens permitted hereunder, provided, however, that it shall not constitute a breach hereunder if (i) the Borrower shall be contesting in good faith, by appropriate legal and/or administrative proceedings diligently pursued, the imposition of any such tax, assessment, governmental charge or levy, or demand, and in the event any lien has arisen as a result of any delinquency with respect to the nonpayment of any of the foregoing, the Borrower shall have provided reserves in an adequate amount, adequate insurance, an adequate bond or other assurance of payment to cover the discharge of such lien as required with respect to such lien; (ii) liens are incurred or made (including deposits made) in the ordinary course of business (A) in connection with worker's compensation, unemployment insurance, social security and other like laws, or (B) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations, in each case not incurred in connection with the construction, maintenance, or operation of the Project or (iii) "purchase money security interests" (within the meaning of NRS 104.9107) which are originally created to secure payment of a portion of the purchase price of personal property acquired by the Borrower, so long as such security does not exceed 100% of the purchase price of such personal property, provided that this clause (iii) shall not apply to any property acquired pursuant to the Design-Build Agreement.

(f)     Right of Trustee to Make Payments. If the Borrower fails to make any payment required by this Agreement or the Indenture or to comply with any of the covenants in this Agreement, the Trustee shall have the right, but not the obligation, upon ten days' prior written notice to the Borrower, to make such payment or to effect such compliance on behalf of the Indenture. All amounts expended by the Trustee under this Paragraph shall be deemed additional obligations secured hereunder, and the Borrower shall reimburse the Trustee promptly after demand for any amounts expended by it, with interest thereon at the rate of 8% per annum.

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

(g)   Project Agreements; No Amendments; Assignments.   The Borrower covenants to perform each of its material covenants and obligations, remain in compliance with all requirements of, and enforce each and every of its material rights under the Project Agreements. The Borrower further covenants and agrees that it shall not amend, modify, or terminate or make any election or give any consent, waiver, or approval under or otherwise take any other action which is materially adverse to the security for the Bonds with respect to any of the Project Agreements nor assign any rights or delegate any duties thereunder without the prior written consent of the Director and the Insurer. The Borrower further covenants that it will use its best efforts to, in any successor or future Project Agreement of the same nature as is contained in the Collateral, provide for the granting of security interests therein or assignment thereof to the Trustee for the benefit of the Bondholders.

(h)   Indebtedness.   (i) The Borrower will not, directly or indirectly, expressly or by operation of law, create, incur, issue, assume, guarantee or in any manner become or remain liable, contingently or otherwise, in respect of, or suffer to exist, any Indebtedness, except for (A) Senior Bonds; (B) Other Parity Senior Debt; (C) Subordinate Bonds; (D) Other Subordinate Debt; (E) purchase money security interests that are permitted under 5.6(c) above or (F) trade obligations and normal accruals in the ordinary course of business which are not more than sixty (60) days past due or with respect to which the Borrower is contesting in good faith the amount or validity thereof by appropriate proceedings in an aggregate amount of less than $1,000,000, and then only to the extent that the Borrower has set aside on its books adequate reserves therefore.

(ii)   Prior to the issuance of any Additional Debt, the Borrower shall submit to the Trustee and the Director a Certificate, supported by a report of a Ridership and Revenue Consultant acceptable to the Director, to the effect that

(A)   no Loan Default Event has occurred and is continuing under the Financing Agreement;

(B)   the Debt Service Reserve Funds are fully funded;

(C)   incurrence of such Additional Debt does not violate any covenant of the Borrower contained in any Project Agreements;

(D)   in the case of the issuance of 1st Tier Parity Debt, Projected Net Project Revenues will be, after issuance of and taking into account debt service payable with respect to such additional 1st Tier Parity Debt, at least equal to (I) 200% of 1st Tier Debt Service, (II) 150% of 1st Tier Debt Service and 2nd Tier Debt Service and (III) 125% of 1st Tier Debt Service, 2nd Tier Debt Service and Subordinate Debt Service;

(E)   in the case of the issuance of 2nd Tier Parity Debt, Projected Net Project Revenues will be, after issuance of and taking into account debt service payable with respect to such additional 2nd Tier Parity Debt, at least equal to (I) 150% of 1st Tier Debt Service and 2nd Tier Debt Service and (II)

125% of 1st Tier Debt Service, 2nd Tier Debt Service and Subordinate Debt Service;

(F)     in the case of issuance of Subordinate Debt, Projected Net Project Revenues will be, after issuance of and taking into account debt service payable with respect to such additional Subordinate Debt, at least equal to 125% of the 1st Tier Debt Service, 2nd Tier Debt Service and Subordinate Debt Service;

(G)     in the case of issuance of Additional Debt the proceeds of which will not be used to finance or refinance the Initial Project, the issuance of such Additional Debt has been approved in writing by the Holders of 100% of the Accreted Value of Subordinate Bonds Outstanding; and

(H)     the issuance of such Additional Debt has been approved in writing by the Insurer, provided that such approval shall not be required (I) in the case of the issuance of Additional Debt the proceeds of which will be used to finance the Initial Project, and the requirements of subparagraphs (D), (E), and (F) have been met, (II) in the case of the issuance of Additional Debt the proceeds of which will be used to refinance the Initial Project, and the requirements of Section 5.6 (h)(v) have been met or (III) as otherwise provided in Section 5.6(h)(v).

For the purposes of making the calculations required in subsections (D), (E) or (F) in connection with Subordinate Debt, there shall be added to the Debt Service due and payable in that year on the Subordinate Bonds the amount required by the Operating and Maintenance Agreement to be deposited in such year into the Capital Replacement Fund, plus all principal and interest due and payable on any Deferred Payment Obligations and Incentive Payments in such Fiscal Year. For the further purposes of making these calculations, all Deferred Payment Obligations and Incentive Payments will be deemed to be payable on the same schedule as the Subordinate Bonds.

(iii)     The Borrower may incur Other Parity Senior Debt only if: (A) such Other Parity Senior Debt is pursuant to an indenture or trust agreement with the Trustee; (B) the Other Lender with respect to such Other Parity Senior Debt has entered into an intercreditor agreement or subordination agreement with the Trustee satisfactory to the Trustee and the Insurer with respect thereto; and (C) proceeds of such Other Parity Senior Debt are used only to refund or defease outstanding Indebtedness or pay for improvements to the Project, and (D) such obligations may not be accelerated prior to the maturity of any other 1st Tier Parity Debt or 2nd Tier Parity Debt. The Borrower's obligations with respect to any Other Parity Senior Debt must provide for monthly deposits or payments of each month's interest due or accruing, and not more than 1/12 of the next annual principal or Accreted Value payment due with respect to such Other Parity Senior Debt.

(iv)     The Borrower may incur Other Subordinate Debt if: (A) such debt is secured by the Collateral on a subordinate basis to the lien and pledge of the Collateral made by the Borrower in favor of the Senior Bonds, (B) such debt is not secured by any pledge, lien, or mortgage of the Project, the Project Revenues or the Collateral except as

22

stated in (A), (C) otherwise complies with the Subordinate Indenture and all other Project Agreements and (D) such obligations may not be accelerated prior to the maturity of any Senior Debt or any Subordinate Bonds.

      (v)     Notwithstanding the foregoing

           (A)   the Borrower may, without complying with subsections (h)(ii)(D)-(G) hereof, incur up to $35,000,000 of 1st Tier Parity Debt or up to $17,000,000 of 2nd Tier Parity Debt or up to $35,000,000 of Subordinate Debt, or a combination thereof to the extent permitted by this Section 5.6(h)(v)(A), in such respective amounts as are requested in writing by the Borrower to the Director, but in no event in the aggregate more than an amount equal to $35,000,000 less the amount of any Deferred Progress Payment Obligations incurred, if any, to fund completion of the Initial Project for costs described by Section 12.5.1 of the Design-Build Agreement, provided that the provisions of subsection (h)(ii)(H) will not be applicable for the issuance of 2nd Tier Parity Debt or Subordinate Debt pursuant to this subsection (h)(v)(A), or

           (B)   the Borrower may, without complying with subsections (h)(ii)(D)-(H) hereof, incur 1st Tier Parity Debt or 2nd Tier Parity Debt in any amount to refund all or any part of a series of the Senior Debt so long as (I) prior to the issuance thereof the Trustee has received a Certificate of the Borrower (approved by the Independent Certified Public Accountant) to the effect that annual Debt Service on the Tier of Senior Debt to be outstanding after the refunding (including the refunding obligations) does not exceed the annual Debt Service of such Tier of Senior Debt which was outstanding prior to the refunding in each year in which any such refunded Senior Bonds or Other Parity Senior Debt would have been outstanding but for the issuance of the refunding Senior Bonds or Other Parity Senior Debt, (II) the maturity dates of such refunding 1st Tier Parity Debt or 2nd Tier Parity Debt are not later than the maturity dates of the refunded Senior Debt, and (III) the Borrower has delivered a Certificate to the effect that issuance of such refunding Senior Debt will not materially adversely affect the rights of Holders of Subordinate Bonds.

      SECTION 5.7.  AUDITED FINANCIAL STATEMENTS; EMPLOYMENT AND OTHER REPORTS. (a) The Borrower covenants that it will use its best efforts to deliver within 120 days, and, in any case, will deliver within one hundred eighty (180) days after the close of each Fiscal Year, two (2) copies of the audited financial statements of the Borrower as of the end of such Fiscal Year such financial statements to be accompanied by (i) an opinion with respect thereto of the Independent Certified Public Accountant preparing such statements, which opinion shall state that the examination of the Independent Certified Public Accountant in connection with such financial statements has been made in accordance with Generally Accepted Auditing Principles, and, accordingly, included such tests of the accounting records and such other auditing procedures as were considered necessary in the circumstances, and that such financial statements present fairly the financial position of the Borrower as at such date and the results of operations thereof for such period and have been prepared in accordance with Generally Accepted Accounting Principles; and (ii) a Certificate of the Borrower stating that

DOCSSF1:477676.3
40476-110 RDH

such financial statements are consistent with the information presented to the Independent Certified Public Accountant for use in preparation of the audited financial statements of the Borrower.

(b)     During the first three (3) Fiscal Years of the Borrower following the completion of the Project, and thereafter only upon the request of the Director, the Borrower shall furnish, within thirty (30) days following the end of the Borrower's Fiscal Year, a written report to the Director, stating the number of full-time and part-time employees of the Borrower employed at the Project during such Fiscal Year, and supplying such current information as the Director shall request regarding other matters covered in its application for revenue bonds financing.

SECTION 5.8.     RATE COVENANT. (a) Amount of Rates, Fees and Charges. The Borrower will at all times fix and prescribe fares, fees and charges for the use of the Project as permitted under the Franchise Agreement which will be at least sufficient to yield Net Project Revenues during each Fiscal Year equal to each of the following: (i) one hundred forty percent (140%) of 1st Tier Debt Service for such Fiscal Year; (ii) one hundred ten percent (110%) of 1st Tier Debt Service and 2nd Tier Debt Service for such Fiscal Year; and (iii) one hundred ten percent (110%) of 1st Tier Debt Service, 2nd Tier Debt Service and Subordinate Debt Service for such Fiscal Year. The Borrower may make adjustments from time to time in such fares, fees and charges and may make such classification thereof as it deems necessary, but shall not reduce the fares, fees and charges then in effect unless the Net Project Revenues from such reduced fares, fees and charges will at all times be sufficient to meet the requirements of this section and will increase rates, fees and charges if necessary to produce Net Project Revenues in amounts sufficient to meet the requirements of this section. For purposes of making the aforementioned calculations in connection with Subordinate Bonds, there shall be added to the Debt Service due and payable in that year on the Subordinate Bonds the amount required by the Operation and Maintenance Agreement to be deposited in such year into the Capital Replacement Fund, plus all principal and interest due and payable on any Deferred Payment Obligations and Incentive Payments in such Fiscal Year. For the further purposes of making these calculations, all Deferred Payment Obligations and Incentive Payments will be deemed to be payable on the same schedule as the Subordinate Bonds.

(b)     In the event that at the end of any Fiscal Year, Net Project Revenues were not collected equal to the requirements of Section 5.8(a), the Borrower will commission, at its own expense, a Ridership and Revenue Consultant to prepare a fare study to recommend actions to remedy such noncompliance. The Borrower shall use its best efforts to implement such recommendations as soon as possible to comply with the terms hereof. Notwithstanding paragraph (a) above, no Loan Default Event shall occur with respect to this provision if the Borrower has implemented the recommendations of the Ridership and Revenue Consultant and the Borrower actually collected from operation of the Project Net Project Revenues equal to 100% of Debt Service due and payable for such Fiscal Year.

(c)     Collection of Fares. The Borrower will have in effect at all times rules regarding payment of fares, fees, and charges for use of the Project.

Monorail Financing Agreement

DOCSSF1:4776763
40476-110 RJH

SECTION 5.9.   GENERAL TAX COVENANT.  It is the intention of the parties hereto that interest on the Bonds shall be and remain tax-exempt, and to that end the Borrower covenants that it will not act or fail to act if such action or failure to act would cause the interest on the Senior Bonds or the Subordinate Bonds not to be excluded from gross income for federal income tax purposes.  In addition, the Borrower covenants to comply with all requirements in the Tax Certificate, which is incorporated herein and made a part hereof by this reference, in this Section and in Section 5.10 for the benefit of the Trustee and each and every holder of the Bonds.

SECTION 5.10.   SPECIAL ARBITRAGE CERTIFICATIONS.   The Director hereby certifies to the Borrower that based upon the representations of the Borrower contained in the Tax Certificate, the issuance of the Bonds will not violate any provisions of Section 103, and in particular Section 148 of the Code or Treasury Regulations issued under that Section of the Code, such that Bonds are not tax-exempt.  To that end, the Borrower acknowledges that it has read Sections 5.06 and 6.06 of the Indenture and that it will comply with the requirements of those sections and the Tax Certificate as if they were set forth in full in this Agreement.

SECTION 5.11.   SUBSTITUTION OF THE MANAGER OF THE PROJECT. A successor entity or assignee of the Manager under the Management Agreement may lease, operate and manage all or a portion of the Project provided that:

(a)     Such assignment is permitted under the Management Agreement; and

(b)     The written consent of the Director has been received by the Trustee.

SECTION 5.12.   NO WARRANTY OR CONDITION OR SUITABILITY BY DIRECTOR.   The Borrower recognizes that the Director does not deal in goods of the kind compromising components of the Project or otherwise hold itself out as having knowledge or skill peculiar to the practices or goods involved in the Project and that the Director is not one to whom such knowledge or skill may be attributed by its employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill. The Borrower further recognizes that since the components of the Project have been and are to be designated and selected by the Borrower, the DIRECTOR HAS NOT MADE AN INSPECTION OF THE PROJECT OR OF ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, AND, EXCEPT AS OTHERWISE PROVIDED HEREIN, THE DIRECTOR MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED OR OTHERWISE, WITH RESPECT TO THE SAME OR TO THE LOCATION, USE, DESCRIPTION, DESIGN, MERCHANTABILITY, FITNESS FOR USE FOR ANY PARTICULAR PURPOSE, CONDITION OR DURABILITY THEREOF, TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, IT BEING AGREED THAT ALL RISKS INCIDENT THERETO ARE TO BE BORNE BY THE BORROWER AND NOT THE DIRECTOR.  IN THE EVENT OF ANY DEFECT OR DEFICIENCY OF ANY NATURE IN THE PROJECT OR ANY FIXTURE OR OTHER ITEM CONSTITUTING A PORTION THEREOF, WHETHER PATENT OR LATENT, THE DIRECTOR SHALL HAVE NO RESPONSIBILITY OR LIABILITY WITH RESPECT THERETO.  THE PROVISIONS OF THIS SECTION HAVE BEEN NEGOTIATED AND ARE INTENDED TO BE A COMPLETE EXCLUSION AND NEGATION OF ANY WARRANTIES OR REPRESENTATIONS BY

25                            Monorail Financing Agreement

THE DIRECTOR, EXPRESS OR IMPLIED (TO THE EXTENT PERMITTED BY
APPLICABLE LAW), WITH RESPECT TO THE PROJECT OR ANY FIXTURE OR OTHER
ITEM CONSTITUTING A PORTION THEREOF, WHETHER ARISING PURSUANT TO
THE UNIFORM COMMERCIAL CODE OF THE STATE OF NEVADA OR ANOTHER
LAW NOW OR HEREAFTER IN EFFECT OR OTHERWISE.

SECTION 5.13. INDEPENDENT ENGINEER. The Borrower shall engage an
Independent Engineer as may be necessary to comply with the terms hereof. The Borrower may,
upon 30 days prior written notice to the Trustee, the Director and the Insurer, replace the
Independent Engineer. Such replacement Independent Engineer shall be a nationally recognized
firm or firms with civil engineering and transportation experience and qualified so to act in the
State.

SECTION 5.14. BOND INSURANCE. (a) In consideration of the value to the
Borrower and the Project from the delivery of the Financial Guaranty Insurance Policy, the
Borrower agrees to comply with all provisions of the Senior Indenture relating to the Insurer and
its rights, as if such provisions were set forth in this Agreement, as the context would require.

(b)     The Borrower covenants that the Persons serving as the Contractor, the
Operator, the Independent Engineer, the Manager, the Revenue and Ridership Consultant and the
Trustee, as of the date of issuance, will not be replaced or substituted without the prior written
consent of the Insurer.

(c)     To the extent that this Financing Agreement confers upon or gives or
grants to the Insurer any right, remedy or claim under or by reason of this Financing Agreement,
the Insurer is hereby explicitly recognized as being a third-party beneficiary hereunder and may
enforce any such right, remedy or claim conferred, given or granted hereunder.

SECTION 5.15. INTERCONNECTION OF THE PROJECT. The Borrower
covenants that prior to the interconnection of the Project with another fixed guideway
transportation system, the Borrower will deliver to the Insurer a written report of a Ridership and
Revenue Consultant demonstrating on a pro forma basis that such interconnection, taking into
account Project Revenues to be received under any fare sharing agreement or other arrangement
in connection with such interconnection, will not impair the ability of the Borrower to meet its
obligations under Section 5.8(a) of this Agreement for the three Fiscal Years immediately
following the date of interconnection.

SECTION 5.16. CONTINUING DISCLOSURE. The Borrower shall undertake
the continuing disclosure requirements promulgated under S.E.C. Rule 15c2-12, as it may from
time to time hereafter be amended or supplemented, and the Director shall have no liability to the
Holders of the Senior Bonds or any other person with respect to such disclosure matters.
Notwithstanding any other provision of this Agreement, failure of the Borrower to comply with
the requirements of S.E.C. Rule 15c2-12, as it may from time to time hereafter be amended or
supplemented, shall not be considered an Event of Default; however, the Trustee at the written
request of the Holders of at least 25% aggregate principal amount of Outstanding Senior Bonds,
shall, but only to the extent indemnified to its satisfaction from and against any cost, liability or
expense related thereto, including, without limitation, reasonable fees and expenses of its

26                                    Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

attorneys and advisors and additional fees and expenses of the Trustee, or any Bondholder or beneficial owner of any Senior Bonds may take such actions as may be necessary and appropriate, including seeking mandate or specific performance by court order, to cause the Borrower to comply with its obligations under this Section 5.16.

SECTION 5.17.   OTHER COVENANTS.   (a)   The Borrower agrees to cooperate with the Holders of the Subordinate Bonds to provide the Certificate required under Section 2.06 of the Subordinate Indenture upon request of any such Holders.

(b)   The Borrower acknowledges that no provisions of this Agreement, the Senior Indenture or the Subordinate Indenture are intended to modify the rights and obligations of the parties under the Design-Build Agreement, except that, notwithstanding the provisions of this subsection 5.17(b), specific references in the Design-Build Agreement to any of the foregoing documents are intended to be effective.

(c)   The Borrower shall notify the Trustee and the Holders of the Subordinate Bonds, Series 2000C through 2000I:

(i) at least thirty (30) days prior to the time the Borrower estimates the balance in the Construction Fund will reach $1,000,000, so that such Holders may pay the second installment of the purchase price of such Subordinate Bonds not later than thirty (30) days following the date of such notice; and

(ii) at any time that the Guaranteed Completion Date under the Design-Build Agreement has been extended, so that such Holders may obtain extensions of their Letters of Credit.

(d)   The Borrower shall notify the Trustee of the date and the amount by which the Contractor has performed services under the Design-Build Agreement which are to be compensated by delivery of the Subordinate Bonds, Series 2000A and 2000B, so that the Trustee may endorse such amount on those Subordinate Bonds as having been constructively paid by the Contractor and loaned to the Borrower pursuant to this Agreement.

## ARTICLE VI

## DAMAGE, DESTRUCTION AND CONDEMNATION; USE OF PROCEEDS

SECTION 6.1.   OBLIGATION TO CONTINUE PAYMENTS.   If prior to full payment of the Bonds (or provision for payment thereof in accordance with the provisions of the Senior Indenture) (i) the Project or any portion thereof is destroyed (in whole or in part) or is damaged by fire or other casualty, or (ii) title to, or the temporary use of, the Project or any portion thereof shall be taken under the exercise of the power of eminent domain by any governmental body or by any person, firm or corporation acting under governmental authority, the Borrower shall nevertheless be obligated to continue to pay the amounts specified in Article IV hereof, to the extent not prepaid in accordance with Article VIII hereof.

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

SECTION 6.2.   APPLICATION OF NET PROCEEDS. The Borrower shall be entitled to the Net Proceeds, if any, of any insurance or condemnation awards resulting from the damage, destruction or condemnation of the Project or any portion thereof and such Net Proceeds shall be applied in one or more of the following ways at the election of the Borrower, by written notice to Director and the Trustee:

(a)   The prompt repair, restoration, relocation, modification or improvement of the stage of completion of construction of the damaged, destroyed or condemned portion of the Project to enable such portion of the Project to allow operation to generate at least the same Net Project Revenues as generated prior to such damage or destruction or exercise of such power of eminent domain (or, if prior to the Completion Date, to complete the Project as originally designed). Any balance of the Net Proceeds remaining after such work has been completed shall be deposited in the Revenue Fund to be applied to the payment of principal of and premium, if any, and interest on the Bonds, or, if the Bonds have been fully paid (or provision for payment thereof has been made in accordance with the provisions of the Senior Indenture), any remaining amounts shall be paid to the Borrower.

(b)   Prepayment of all or a portion of the amounts payable hereunder, in accordance with Article VIII hereof, and redemption of Bonds; provided that no part of the Net Proceeds may be applied for such purpose unless (1) all of the amounts payable under this Agreement are so prepaid and all Outstanding Bonds are to be redeemed in accordance with the Indenture, or (2) in the event that less than all of the amounts payable hereunder are so prepaid, the Borrower shall furnish to the Director and the Trustee certificates of Authorized Representatives of the Borrower and of the Independent Engineer acceptable to the Director and the Trustee stating (i) that the property forming part of the portion of the Project that was damaged or destroyed by such casualty or was taken by such condemnation proceedings is not essential to the Borrower's operation of the Project sufficient to generate Net Project Revenues required hereunder or (ii) that such part of the portion of the Project theretofore completed has been repaired, replaced, restored, relocated, modified or improved to enable such portion of the Project to allow operation to generate at least the same Net Project Revenues as the Project was generating prior to such damage or destruction or the taking by such condemnation proceedings (or, if prior to the Completion Date, to complete the Project as originally designed).

SECTION 6.3.   INSUFFICIENCY OF NET PROCEEDS. If the Project or a portion thereof is to be repaired, restored, relocated, modified or improved pursuant to Section 6.2 hereof, and if the Net Proceeds are insufficient to pay in full the cost of such repair, restoration, relocation, modification or improvement, the Borrower will nonetheless complete the work or cause the work to be completed, and will pay or cause to be paid any cost in excess of the amount of the Net Proceeds held in escrow.

SECTION 6.4.   DAMAGE TO OR CONDEMNATION OF OTHER PROPERTY. The Borrower shall be entitled to the Net Proceeds of any insurance or condemnation award or portion thereof made for damages to or takings of its property not included in the Project.

28

DOCSSF1:477676.3
40476-110 RJH

ARTICLE VII

EVENTS OF DEFAULT AND REMEDIES

SECTION 7.1.   EVENTS OF DEFAULT.  Any one of the following which occurs and continues shall constitute a Loan Default Event:

(a)   failure of the Borrower to make any payment required by Section 4.2(a)(i) hereof when due;

(b)   failure of the Borrower to make any payment required by Section 4.2(a)(ii) hereof, but only at the final maturity of the Subordinated Bonds;

(c)   failure of the Borrower to observe and perform any covenant, condition or agreement on their part required to be observed or performed by this Agreement other than as provided in (a) or (b), which continues for a period of 30 days after written notice delivered to the Borrower which notice shall specify such failure and request that it be remedied, given to the Borrower by the Director or the Trustee, unless the Director and the Trustee shall agree in writing to an extension of such time; provided, however, that if the failure stated in the notice cannot be corrected within such period, the Director and the Trustee will not unreasonably withhold their consent to an extension of such time if corrective action is instituted within such period and diligently pursued until the default is corrected; or

(d)   existence of an Event of Default under and as defined in Section 7.01 of the Senior Indenture or Section 7.01 of the Subordinate Indenture.

SECTION 7.2.   REMEDIES ON DEFAULT.  Subject to the provisions of Section 7.1 hereof, and further subject to the requirement that in taking any of the following actions the Trustee shall act in accordance with any directions of the Insurer, whenever any Loan Default Event shall have occurred and shall be continuing,

(a)   The Trustee may have access to and may inspect, examine and make copies of the books and records and any and all accounts, data and federal income tax and other tax returns of the Borrower.

(b)   The Director or the Trustee may take whatever action at law or in equity as may be necessary or desirable to collect the payments and other amounts then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of the Borrower under this Agreement or the Borrower or other obligors under the Project Agreements which constitute the Collateral, provided, however, that the Trustee shall have no power to accelerate Loan Repayments under Section 4.1(a) hereof except as provided in the second paragraph below.

In case the Borrower shall fail forthwith to pay such amounts upon such demand, the Trustee shall be entitled and empowered, but is not obligated except to the extent it is instructed to take actions and indemnified by Holders of any Series of Bonds, to institute any action or proceeding at law or in equity for the collection of the sums so due and unpaid, and

29

Monorail Financing Agreement

may prosecute any such action or proceeding to judgment or final decree, and may enforce any such judgment or final decree against the Borrower and collect in the manner provided by law the moneys adjudged or decreed to be payable. Notwithstanding anything to the contrary herein, the Loan Repayments and other amounts payable hereunder shall not be subject to acceleration except as provided in the following paragraph.

In case proceedings shall be pending for the bankruptcy or for the reorganization of the Borrower under the federal bankruptcy laws or any other applicable law, or in case a receiver or trustee shall have been appointed for the property of the Borrower or in the case of any other similar judicial proceedings relative to the Borrower, or the creditors or property of the Borrower, then the Trustee, if permitted or required to declare amounts due and payable with respect to a Tier of Bonds under the Senior Indenture or Subordinate Indenture, as applicable, shall be entitled and empowered, by intervention in such proceedings or otherwise, to file and prove a claim or claims for the whole amount owing and unpaid pursuant to this Agreement and, in case of any judicial proceedings, to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee allowed in such judicial proceedings relative to the Borrower, their creditors or their property, and to collect and receive any moneys or other property payable or deliverable on any such claims, and to distribute such amounts as provided in the Senior Indenture after the deduction, to the extent permitted under the Senior Indenture, of its reasonable charges and expenses. Any receiver, assignee or trustee in bankruptcy or reorganization is hereby authorized to make such payments to the Trustee, and to pay to the Trustee any amount due it for reasonable compensation and expenses, including reasonable expenses and fees of counsel incurred by it up to the date of such distribution.

(c)     Notwithstanding any provision of this Section 7.2, the occurrence of a Loan Default Event shall not affect the priority of payments to be made from Project Revenues under Section 4.1 of this Agreement.

SECTION 7.3.    AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES. In the event the Borrower should default under any of the provisions of this Agreement and the Director or the Trustee should employ attorneys or incur other expenses (including expert witness fees and expenses) for the collection of the payments due under this Agreement or the enforcement of performance or observance of any obligation or agreement on the part of the Borrower herein contained, the Borrower agrees to pay to the Director or the Trustee the reasonable fees of such attorneys and such other reasonable expenses so incurred by the Director or the Trustee.

SECTION 7.4.    NO REMEDY EXCLUSIVE. No remedy herein conferred upon or reserved to the Director or the Trustee is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity or by statute. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Director or the Trustee to exercise any remedy reserved to it in this Article, it shall not be necessary to give any notice, other than such notice as may be herein expressly required. Such rights and remedies as are given the Director hereunder shall also

30                                        Monorail Financing Agreement

extend to the Trustee, which may exercise the Director's rights as assignee or its own rights, and the Trustee and the holders of the Bonds shall be deemed third party beneficiaries of all covenants and agreements herein contained.

SECTION 7.5.    NO ADDITIONAL WAIVER IMPLIED BY ONE WAIVER. In the event any agreement or covenant contained in this Agreement should be breached by the Borrower and thereafter waived by the Director or the Trustee, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

ARTICLE VIII

PREPAYMENT

SECTION 8.1.    REDEMPTION   OF   BONDS   WITH   PREPAYMENT MONEYS. By virtue of the assignment of the rights of the Director under this Agreement to the Trustee as is provided in Section 4.4 hereof, the Borrower agrees to and shall pay directly to the Trustee any amount permitted or required to be paid by it under this Article VIII. The Trustee shall use the moneys so paid to it by the Borrower to redeem the Senior Bonds or Subordinate Bonds on the date set for such redemption pursuant to Section 8.5 hereof. The Director shall call bonds for redemption as required by Article IV of the Indenture or as requested by the Borrower pursuant to the Indenture or this Agreement.

SECTION 8.2.    OPTIONS TO PREPAY INSTALLMENTS.  The Borrower shall have the option to prepay the amounts payable under Section 4.2(a) hereof and under the Notes by paying to the Trustee, for deposit in the Revenue Fund, the amount set forth in Section 8.4 hereof, under the following circumstances:

(a)    The Borrower may prepay all or any part of the Senior Loan Repayments under the circumstances described in Section 6.2(b) hereof, and cause all or any part of the Senior Bonds to be redeemed at the prices set forth in Section 4.01(1) of the Senior Indenture.

(b)    The Borrower shall also have the option to prepay all or any part of the Senior Loan Repayments and to cause all or any part of the Bonds to be redeemed at the times and at the prices set forth in Section 4.01 (2) of the Senior Indenture.

(c)    The Borrower shall also have the option to prepay all or any part of the Subordinate Loan Repayments and to cause all or any part of the Subordinate Bonds to be redeemed at the times and at the prices set forth in Section 4.01(1) of the Subordinate Indenture.

(d)    The Borrower shall not have the option to prepay any amounts with respect to Senior Loan Repayments and cause the optional redemption of any Senior Bonds pursuant to this Section 8.2 unless and until all Deferred Payment Obligations, Incentive Payments and Subordinate Bonds have been paid or prepaid in full, except for prepayments in connection with the refunding of any Senior Bonds complying with the provisions of Section 5.6(h)(v)(B).

SECTION 8.3.    MANDATORY PREPAYMENT.  The Borrower shall have and hereby accept the obligation to prepay in whole or in part the Loan Repayments required by

31                           Monorail Financing Agreement

Section 4.2(a) of this Agreement, together with interest accrued, but unpaid, thereon, to be used to redeem all or a part of the Outstanding Senior Bonds if mandatory sinking fund redemption is required by Section 4.01(3) of the Senior Indenture or all or a part of the Subordinate Bonds if redemption is required by Section 4.01(2) of the Subordinate Indenture, subject to the provisions of the Subordinate Indenture.

The amount payable by the Borrower in the event of a prepayment required by this Section shall be determined as set forth in Section 8.4 and shall be deposited in the Revenue Fund of the respective Indenture.

SECTION 8.4.   AMOUNT OF PREPAYMENT.   In the case of a prepayment of the entire amount due hereunder pursuant to and in accordance with Section 8.2 or 8.3 hereof, the amount to be paid shall be a sum sufficient, together with other funds and the yield on any securities deposited with the Trustee and available for such purpose, to pay (1) the principal of all Senior Bonds and Subordinate Bonds Outstanding on the redemption date specified in the notice of redemption, plus interest accrued and to accrue to the payment or redemption date of the Bonds, plus premium, if any, pursuant to the respective Indenture, (2) all reasonable and necessary fees and expenses of the Director, the Trustee and any paying agent accrued and to accrue through final payment of the Bonds and (3) all other liabilities of the Borrower accrued and to accrue under this Agreement.

In the case of partial prepayment of the Loan Repayments, the amount payable shall be a sum sufficient, together with other funds deposited with the Trustee and available for such purpose, to pay the principal amount of and premium, if any, and accrued interest on the Bonds to be redeemed, as provided in the respective Indenture, and to pay expenses of redemption of such Bonds.

SECTION 8.5.   NOTICE OF PREPAYMENT.   To exercise an option granted in or to perform an obligation required by this Article VIII, the Borrower shall give written notice at least fifteen (15) days prior to the last day by which the Trustee is permitted to give notice of redemption pursuant to Section 4.03 of the Senior Indenture or Section 4.03 of the Subordinate Indenture, to the Director and the Trustee specifying the date upon which any prepayment will be made.   If the Borrower fails to give such notice of a prepayment in connection with a mandatory redemption under this Agreement, such notice may be given by the Director, by the Trustee or by the Bondholder. The Director and the Trustee, at the request of the Borrower or the Bondholders shall forthwith take all steps necessary under the applicable provisions of the corresponding Indenture (except that the Director shall not be required to make payment of any money required for such redemption) to effect redemption of all or part of the then Outstanding Bonds, as the case may be, on the earliest practicable date thereafter on which such redemption may be made under applicable provisions of the corresponding Indenture.

ARTICLE IX

NON-LIABILITY OF DIRECTOR; EXPENSES; INDEMNIFICATION

SECTION 9.1.   NON-LIABILITY OF DIRECTOR.   The Director shall not be obligated to pay the principal of, or premium, if any, or interest on the Senior Bonds or the

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

Subordinate Bonds, except from Revenues. The Borrower hereby acknowledges that the Director's sole source of moneys to repay the Senior Bonds or the Subordinate Bonds will be provided by the payments made by the Borrower pursuant to this Agreement, together with other Revenues, including investment income on certain funds and accounts held by the Trustee under the Indenture, and hereby agrees that if the payments to be made hereunder shall ever prove insufficient to pay all principal of, and premium, if any, and interest on the Bonds as the same shall become due (whether by maturity, redemption, acceleration or otherwise), then upon notice from the Trustee, the Borrower shall pay such amounts as are required from time to time to prevent any deficiency or default in the payment of such principal, premium or interest.

SECTION 9.2.    EXPENSES. The Borrower covenants and agrees to pay and to indemnify the Director and the Trustee against all costs and charges, including reasonable fees and disbursements of attorneys, accountants, consultants and other experts, incurred in good faith in connection with this Agreement, the Bonds, the Senior Indenture or the Subordinate Indenture, including but not limited to any judicial or administrative proceeding or investigation or audit.

SECTION 9.3.    INDEMNIFICATION. The Borrower releases the Director, Clark County, Nevada and the Trustee from, and covenants and agrees that neither the Director, Clark County, Nevada nor the Trustee shall be liable for, and covenants and agrees, to the extent permitted by law, to indemnify and hold harmless the Director, Clark County, Nevada and the Trustee and their members, officers, employees and agents (each an "Indemnified Party") from and against, any and all losses, claims, damages, liabilities or expenses, of every conceivable kind, character and nature whatsoever arising out of, resulting from or in any way connected with (1) the Project, or the conditions, occupancy, use, possession, conduct or management of, or work done in or about, or from the planning, design, acquisition, installation or construction of the Project or any part thereof; (2) the issuance of any Bonds or any certifications or representations made in connection therewith and the carrying out of any of the transactions contemplated by the Senior Bonds or the Subordinate Bonds and this Agreement, including but not limited to any claims related to the offering and sale of any Bonds, or relating to the Tax-exempt status of any Bonds; (3) the Trustee's acceptance or administration of the trusts under the Senior Indenture, or the exercise or performance of any of its powers or duties under the Indenture or this Agreement; or (4) the presence, use, storage, release or disposal of any hazardous substances on or about the Project (for purposes of this Section, "hazardous substances" means any substances, pollutants or contaminants now or hereafter included in such (or any similar) term under any federal, state or local statute, law, ordinance or regulation now existing or hereafter enacted or amended); provided that the indemnity required by this Section shall not be required for damages that result from gross negligence or willful misconduct on the part of the party seeking such indemnity. The indemnity required by this Section shall be only to the extent that any loss sustained by an Indemnified Party exceeds the net proceeds the Indemnified Party receives from any insurance carried with respect to the loss sustained. The Borrower further covenants and agrees, to the extent permitted by law, to pay or to reimburse the Indemnified Party for any and all reasonable costs, reasonable attorneys fees, liabilities or expenses incurred in connection with investigating, defending against or otherwise in connection with any such losses, claims, damages, liabilities, expenses or actions, except to the extent that the same arise out of the gross negligence or willful misconduct of the party claiming such payment or reimbursement. The Indemnified Party shall promptly notify the Borrower of any action or proceeding brought in connection with any of the above, and the Indemnified Party

Monorail Financing Agreement

DOCSSFI:477676.3
40476-110 RIH

agrees that it will not settle any such action or proceeding without the prior written consent of the Borrower. If, in the sole discretion of the Director and his officers, employees and agents, an actual or potential conflict exists with respect to the defenses available to the Borrower and the Director or such officers, employees and agents, such Indemnified Party, at the expense of the Borrower, shall have the right to employ separate counsel in any action and participate in the defense thereof, at its option. The Indemnified Party agrees to cooperate fully with the Borrower and to take all action necessary, to the extent it might lawfully do so, to effect the substitution of the Borrower for the Indemnified Party in such action or proceeding. The provisions of this Section shall survive any resignation or removal of the Trustee and the retirement of the Bonds.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.1. NOTICES. All notices, certificates or other communications shall be deemed sufficiently given on the second day following the day on which the same have been mailed by certified mail, postage prepaid, addressed to the Director, the Borrower or the Trustee, as the case may be, as follows:

| | |
|---|---|
| To the Director: | Director of the State of Nevada<br>Department of Business and Industry<br>1665 Hot Springs Road<br>Carson City, Nevada 89710<br>Attention: Chief of Business Finance and Planning |
| To the Borrower: | Las Vegas Monorail Company<br>c/o John J. Haycock, Chairman<br>P.O. Box 340<br>Las Vegas, Nevada 89125-0340<br><br>with copy to<br><br>Michael C. Niarchos, Esq.<br>9220 Pitching Wedge Drive<br>Las Vegas, Nevada 89134 |
| To the Trustee: | Wells Fargo Bank, N.A.<br>Wells Fargo Center<br>1300 SW 5th Avenue, 14th Floor<br>MAC P6101-149<br>Portland, OR 97201 |
| To the Insurer: | Ambac Assurance Corporation<br>One State Street Plaza<br>New York, New York 10004<br>Attn: Surveillance Department |

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

A duplicate copy of each notice, certificate or other communication given hereunder by either the Director or the Borrower to the other shall also be given to the Trustee and the Insurer. The Director, the Borrower, and the Trustee may, by notice given hereunder, designate any different addresses to which subsequent notices, certificates or other communications shall be sent. The Trustee shall provide to the Contractor and the Operator, at their addresses filed with the Trustee or as stated in the Design-Build Agreement and the Operation and Maintenance Agreement, a copy of any notice of a Loan Default Event or any event which, with the passage of time, may become a Loan Default Event.

SECTION 10.2.   SEVERABILITY.   If any provision of this Agreement shall be held or deemed to be, or shall in fact be, illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative, or unenforceable to any extent whatever.

SECTION 10.3.   EXECUTION OF COUNTERPARTS.   This Agreement may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

SECTION 10.4.   AMENDMENTS,   CHANGES   AND   MODIFICATIONS. Subsequent to the initial issuance of Senior Bonds or Subordinate Bonds, and prior to their payment in full, or provision for such payment having been made as provided in the Senior Indenture or the Subordinate Indenture, respectively, this Agreement and the Notes may not be effectively amended, changed, modified, altered or terminated without the written consent of the Trustee, given as provided in the Senior Indenture and the Subordinate Indenture.

SECTION 10.5.   GOVERNING LAW.   This Agreement shall be governed exclusively by and construed in accordance with the applicable laws of the State of Nevada, without regard to conflict of law rules.

SECTION 10.6.   AUTHORIZED REPRESENTATIVE.   Whenever under the provisions of this Agreement the approval of the Borrower is required or the Borrower is required to take some action at the request of the Director, such approval or such request shall be given on behalf of the Borrower by the Authorized Representative, and the Director and the Trustee shall be authorized to act on any such approval or request and neither party hereto shall have any complaint against the other or against the Trustee as a result of any such action taken.

SECTION 10.7.   TERM OF THE AGREEMENT.   This Agreement shall be in full force and effect from the date hereof and shall continue in effect as long as any of the Bonds are outstanding or the Trustee holds any moneys under the Senior Indenture, whichever is later. All representations and certifications by the Borrower as to all matters affecting the tax-exempt status of the Bonds shall survive the termination of this Agreement.

SECTION 10.8.   BINDING EFFECT.   This Agreement shall inure to the benefit of and shall be binding upon the Director, the Borrower and their respective successors and assigns; subject, however, to the limitations contained in Section 5.3 hereof.

SECTION 10.9.   SURVIVAL OF FEE OBLIGATION.   The right of the Director and the Trustee to receive any fees or be reimbursed for any expenses incurred pursuant

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

to this Agreement, and the right of the Trustee to be protected from any liability as provided in this Agreement shall survive the retirement of the Senior Bonds or the Subordinate Bonds or the resignation or removal of the Trustee.

SECTION 10.10. FINANCING STATEMENT. This Agreement shall constitute a financing statement for purposes of NRS Section 104.9501 with respect to the Collateral and the Notes and may be filed in such locations as may be necessary to perfect the interests of the Director and the Trustee therein. The Borrower authorizes the Director to file this Agreement or evidence thereof as necessary to perfect such interests and agrees to cooperate in the preparation and filing thereof.

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by officers authorized to so sign, all as of the date first above written.

DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND
INDUSTRY

By: _____
    Authorized Signatory

LAS VEGAS MONORAIL COMPANY

By: _____
    Chairman of the Board

Monorail Financing Agreement

DOCSSF1:477676.2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by officers authorized to so sign, all as of the date first above written.

DIRECTOR OF THE STATE OF NEVADA
DEPARTMENT OF BUSINESS AND
INDUSTRY

By:_____
            Authorized Signatory


LAS VEGAS MONORAIL COMPANY

By:_____
            Chairman of the Board

EXHIBIT A

THE INITIAL PROJECT

The Project constitutes a 3.8-mile dual guideway monorail transportation system in Clark County. The system will incorporate and upgrade the present monorail connecting the MGM Grand Hotel with Bally's Hotel, and will add approximately 3 miles of additional dual guideway and five additional stations extending northward to the Sahara Hotel. The approximate route and station alignment is described on the attached diagram. In addition, the Project will include an operations, maintenance and service facility, power distribution system and train control system. As part of the Project, the owner will acquire approximately 36 monorail cars.

A-2

Monorail Financing Agreement

·EXHIBIT B-1

REQUISITION OF BORROWER

SENIOR INDENTURE

Costs of Issuance Fund Requisition No. __

Wells Fargo Bank, N.A., as Trustee

      Las Vegas Monorail Company (the "Borrower") hereby requests you, as Trustee under that certain Senior Indenture, dated as of September 1, 2000 (the "Senior Indenture"), by and between the Director of the State of Nevada Department of Business and Industry (the "Director") and you, relating to the Director's Las Vegas Monorail Project Revenue Bonds 1st Tier Series 2000 (the "1st Tier Bonds") and Las Vegas Monorail Project Revenue Bonds 2nd Tier Series 2000 (the "2nd Tier Bonds and, collectively, with the 1st Tier Bonds, the "Bonds"), to pay from the moneys in the Cost of Issuance Fund (the "Fund"), the amounts indicated on Schedule A attached hereto to the individuals, firms and corporations named therein, which amounts are for Costs of Issuance (as defined in the Senior Indenture).

      1.    Amount of Requisition: See Attached Schedule A.

      2.    Each obligation mentioned herein has been properly incurred, and is a proper charge against the Fund.

      3.    The undersigned hereby certify that:  (i) none of the items for which payment is requested has been paid previously from the Fund or from the proceeds of the Bonds; and (ii) each item for which payment is requested is or was necessary in connection with the authorization, issuance, sale and delivery of the Bonds and has been properly incurred and is a proper charge against the Fund.

B-2-1

Monorail Financing Agreement

4.      No Loan Default Event exists under the Financing Agreement, dated as of September 1, 2000 (the "Financing Agreement"), between the Director and the Borrower.

Dated: _____, 2000.

LAS VEGAS MONORAIL COMPANY


By:_____
        Authorized Representative

EXHIBIT C-1

REQUISITION OF BORROWER

SENIOR INDENTURE

Construction Fund Requisition No. __
[Contingency Fund Requisition No. __]

Wells Fargo Bank, N.A., as Trustee

       Las Vegas Monorail Company (the "Borrower") hereby requests you, as Trustee under that certain Senior Indenture, dated as of September 1, 2000 (the "Indenture"), by and between the Director of the State of Nevada Department of Business and Industry (the "Director") and you, relating to the Las Vegas Monorail Project Revenue Bonds 1st Tier Series 2000 (the "1st Tier Bonds") and Las Vegas Monorail Project Revenue Bonds 2nd Tier Series 2000 (the "2nd Tier Bonds and, collectively with the 1st Tier Bonds, the "Bonds"), to pay from the moneys in the Construction Fund (the "Fund"), the amounts indicated on Schedule A attached hereto to the individuals, firms and corporations named therein, which amounts are for Cost of the Project (as defined in the Senior Indenture).

       1.     Amount of Requisition:  See Attached Schedule A.

       2.     Each obligation mentioned herein has been properly incurred, and is a proper charge against the Fund for Cost of the Project as defined in the Senior Indenture.

       3.     The undersigned hereby certify that: (i) none of the items for which payment is requested has been paid previously from the Fund or from the proceeds of the Bonds; (ii) each item for which payment is requested is or was necessary in connection with the Project and has been properly incurred and is a proper charge against the Fund, [and (iii) no funds are on deposit in the Construction Fund].

DOCSSF1:477676.3
40476-110 RJH

Monorail Financing Agreement

4.      No Loan Default Event exists under the Financing Agreement, dated as of September 1, 2000 (the "Financing Agreement"), between the Director and the Borrower, or the items to be paid from this requisition were completed prior to the giving of written notice to the Contractor of the occurrence of such Loan Default Event.

5.      Attached as Schedule B hereto are the invoices and certificates required by the Design-Build Agreement.

Dated: _____ ___, 2000.

                                        LAS VEGAS MONORAIL COMPANY

                                        By:_____
                                                Authorized Representative

[If required:

APPROVED:

Director of the State of Nevada
Department of Business and Industry]

By: _____
        Authorized Signatory]

Monorail Financing Agreement

'SCHEDULE A

| Payee's Name and Address | Amount Due | Purpose of Expenditure |
|---|---|---|
| | | |

Total  $ _____

Monorail Financing Agreement

DOCSSFI:477676.3
40476-110 RIH

EXHIBIT D-1

SENIOR

PROMISSORY NOTE

$451,448,217.30                                                September 1, 2000

THE LAS VEGAS MONORAIL COMPANY, a nonprofit corporation organized under the laws of the State of Nevada (the "Borrower"), for value received, but solely from Project Revenues, hereby promises to pay, upon maturity of the Senior Bonds as hereinafter defined, to the Director of the State of Nevada Department of Business and Industry (the "Director"), or assigns the principal sum of $451,448,217.30, subject to prior payment, with interest on the unpaid principal sum, from the date hereof, until said principal sum shall be paid, and to the extent permitted by law, interest on overdue installments of such interest, at the then interest rate provided in the Senior Bonds. Interest shall be payable or shall accrue at the interest rates payable on the Senior Bonds, and the principal of, premium, if any, and interest on this Note shall be payable at the times as set forth in more detail in the Agreement and the Indenture (as such terms are defined below).

Payments shall be made in lawful money of the United States of America in immediately available funds on the date payment is due, at the principal corporate trust office of Wells Fargo Bank, N.A., as trustee (the "Trustee") in Portland, Oregon, or at such other place as the Trustee may direct in writing.

The Director, by the execution of the Indenture, as hereinafter defined, and the assignment form at the foot of this Note, is assigning this Note and the payments thereon to the Trustee acting pursuant to the Indenture dated as of September 1, 2000 (the "Indenture"), between the Director and the Trustee as security for the Director's $451,448,217.30 in aggregate principal amount of Las Vegas Monorail Project Revenue Bonds 1st Lien Series 2000 and 2nd Lien Series 2000 (the "Senior Bonds"), as issued pursuant to the Indenture. Payments of principal of and interest on this Note shall be made directly to the Trustee for the account of the Director pursuant to such assignment and applied only to the principal of and interest on the Senior Bonds. All obligations of the Borrower hereunder shall terminate when all sums due and to become due pursuant to the Indenture, this Note, and the Agreement, as hereinafter defined, and the Bonds have been paid.

In addition to the payments of principal and interest specified in the first paragraph hereof, the Borrower shall also pay such additional amounts, if any, which, together with other moneys available therefor pursuant to the Indenture, may be necessary to provide for payment when due (whether at maturity, by acceleration or call for redemption, mandatory purchase, purchase upon optional tender, sinking fund redemption or otherwise) of principal and purchase price of, premium, if any, and interest on the Senior Bonds.

The Borrower shall have the option or may be required to prepay this Note in whole or in part upon the terms and conditions and in the manner specified in the Financing Agreement dated as of September 1, 2000 (the "Agreement"), between the Director and the Borrower.

D-1-1                                        Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

This Note is issued pursuant to the Agreement as evidence of the Borrower's payment obligation in Section 4.2(a)(i) thereof and is entitled to the benefits and subject to the conditions thereof, including the provisions of Section 4.3 thereof that the Borrower's obligations thereunder and hereunder shall be unconditional. All the terms, conditions and provisions of the Agreement and the applicable provisions of the Senior Bonds and the Indenture are, by this reference thereto, incorporated herein as a part of this Note.

In case an Loan Default Event, as defined in the Agreement, shall occur, the principal of and interest on this Note may be declared immediately due and payable as provided in the Agreement. This Note shall be governed by, and construed in accordance with, the laws of the State of Nevada.

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed in its corporate name and its seal to be hereunto affixed and attested by its duly authorized officers, all as of the date first above written.

**LAS VEGAS MONORAIL COMPANY**

By: _____
                  Authorized Signatory

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

## ASSIGNMENT

The Director of the State of Nevada Department of Business and Industry (the "Director"), hereby irrevocably assigns, without recourse, the foregoing Note to Wells Fargo Bank, N.A., as Trustee under the Senior Indenture dated as of September 1, 2000 (the "Indenture"), between the Director and the Trustee and hereby directs Las Vegas Monorail Company as the maker of the Note to make all payments of principal of and interest thereon directly to the Trustee at its Principal Corporate Trust Office in Portland Oregon, or at such other place as the Trustee may direct in writing. Such assignment is made as security for the payment of the Director's $451,448,217.30 in aggregate principal amount of 1st Tier Series 2000 and 2nd Tier Series 2000 Las Vegas Monorail Project Revenue Bonds issued pursuant to the Indenture.

DIRECTOR OF THE STATE OF
NEVADA DEPARTMENT OF BUSINESS
AND INDUSTRY

By: _____
        Authorized Signatory

EXHIBIT D-2

FORM OF SUBORDINATE

PROMISSORY NOTE

$48,500,000                                                           September 1, 2000

THE LAS VEGAS MONORAIL COMPANY, a nonprofit corporation organized under the laws of the State of Nevada (the "Borrower"), for value received, hereby promises to pay, upon maturity of the Subordinate Bonds as hereinafter defined, but solely from Project Revenues, to the Director of the State of Nevada Department of Business and Industry (the "Director"), or assigns the principal sum of $48,500,000, subject to prior payment, with interest accruing on the unpaid principal sum, from the date hereof, until said principal sum and the accreted interest thereon shall be paid, and to the extent permitted by law, interest on overdue installments of such interest, at the then interest rate provided in the Subordinate Bonds. Interest shall accrue at the interest rates accruing on the Subordinate Bonds, and the principal of, premium, if any, and interest accrued on this Note shall be payable at the times as set forth in more detail in the Agreement and the Indenture (as such terms are defined below).

Payments shall be made in lawful money of the United States of America in immediately available funds on the date payment is due, at the Principal Corporate Trust Office of Wells Fargo Bank, N.A., as trustee (the "Trustee") in Portland, Oregon, or at such other place as the Trustee may direct in writing.

The Director, by the execution of the Indenture, as hereinafter defined, and the assignment form at the foot of this Note, is assigning this Note and the payments thereon to the Trustee acting pursuant to the Subordinate Indenture dated as of September 1, 2000 (the "Indenture"), between the Director and the Trustee as security for the Director's $48,500,000 in Initial Denominational Amount of Monorail Project Revenue Bonds 3rd Tier Series 2000 A to I, inclusive (the "Subordinate Bonds"), as issued pursuant to the Indenture. Payments of principal of and interest on this Note shall be made directly to the Trustee for the account of the Director pursuant to such assignment and applied only to the principal of and interest on the Subordinate Bonds. All obligations of the Borrower hereunder shall terminate when all sums due and to become due pursuant to the Indenture, this Note, and the Agreement, as hereinafter defined, and the Subordinate Bonds have been paid.

In addition to the payments of principal and interest specified in the first paragraph hereof, the Borrower shall also pay such additional amounts, if any, which, together with other moneys available therefor pursuant to the Indenture, may be necessary to provide for payment when due (whether at maturity, by acceleration or call for redemption, mandatory purchase, purchase upon optional tender, sinking fund redemption or otherwise) of principal and purchase price of, premium, if any, and interest accrued on the Subordinate Bonds.

The Borrower shall have the option or may be required to prepay this Note in whole or in part upon the terms and conditions and in the manner specified in the Financing Agreement dated as of September 1, 2000 (the "Agreement"), between the Director and the Borrower.

D-2-1                                              Monorail Financing Agreement

This Note is issued pursuant to the Agreement as evidence of the Borrower's payment obligation in Section 4.2(a)(ii) thereof and is entitled to the benefits and subject to the conditions thereof, including the provisions of Section 4.3 thereof that the Borrower's obligations thereunder and hereunder shall be unconditional. All the terms, conditions and provisions of the Agreement and the applicable provisions of the Subordinate Bonds and the Indenture are, by this reference thereto, incorporated herein as a part of this Note.

This Note (and the payment obligations of the Borrower under Section 4.2(a)(ii) of the Agreement) are payable solely from Project Revenues and subordinate and junior to that certain Senior Promissory Note of even date herewith made by the Borrower to evidence its payment obligations under Section 4.2(a)(ii) of the Agreement.

This Note is subordinated in right of payment, in the manner and to the extent set forth in the Indenture, to the prior payment in full of such Senior Promissory Note, whether outstanding on the date of such Senior Promissory Note or thereafter created, incurred, assumed, or guaranteed. The Director and each assignee of this Note by his or her acceptance hereof agrees to be bound by such provisions and authorizes and expressly directs the Trustee, on his or her behalf, to take such action as may be necessary or appropriate to effectuate the subordination provided for in the Indenture and the Agreement and appoints the Trustee as his or her attorney-in-fact for such purposes.

In case an Loan Default Event, as defined in the Agreement, shall occur, the principal of and interest on this Note may be declared immediately due and payable as provided in the Agreement. This Note shall be governed by, and construed in accordance with, the laws of the State of Nevada.

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed in its corporate name and its seal to be hereunto affixed and attested by its duly authorized officers, all as of the date first above written.

LAS VEGAS MONORAIL COMPANY

By: _____
Authorized Signatory

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH

## ASSIGNMENT

The Director of the State of Nevada Department of Business and Industry (the "Director"), hereby irrevocably assigns, without recourse, the foregoing Note to Wells Fargo Bank, N.A., as Trustee under a Subordinate Indenture dated as of September 1, 2000 (the "Subordinate Indenture"), between the Director and the Trustee and hereby directs Las Vegas Monorail Company as the maker of the Note to make all payments of principal of and interest thereon directly to the Trustee at its Principal Corporate Trust Office in Portland, Oregon, or at such other place as the Trustee may direct in writing. Such assignment is made as security for the payment of the Director's $48,500,000 in aggregate principal amount of Las Vegas Monorail Project Revenue Bonds Third Series 2000 A to I, inclusive, issued pursuant to the Subordinate Indenture.

**DIRECTOR OF THE STATE OF NEVADA DEPARTMENT OF BUSINESS AND INDUSTRY**

By: _____
                   Authorized Signatory

D-2-3                                    Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RIH

EXHIBIT E

SCHEDULE OF SUBORDINATE BOND REDEMPTION

Pursuant to Section 4.1(d)(IV), Excess Net Project Revenues will be available, under specified conditions, for the prepayment of Subordinate Bonds. The total Initial Denominational Amount of Subordinate Bonds redeemed pursuant to this provision shall not exceed, in the aggregate, the amounts shown on the table below:

| Bond Year Ended September 1 | Aggregate of Initial Denominational Amount of Subordinate Bonds Which May be Redeemed As of the End of Bond Year |
|---|---|
| 2001 | 10% |
| 2002 | 20% |
| 2003 | 30% |
| 2004 | 40% |
| 2005 | 50% |
| 2006 | 60% |
| 2007 | 70% |
| 2008 | 80% |
| 2009 | 90% |
| 2010 | 100% |

E-1

Monorail Financing Agreement

EXHIBIT F

DEBT SERVICE PAYMENT SCHEDULES

Monorail Financing Agreement

DOCSSF1:477676.3
40476-110 RJH